IN RE WILL CONTEST IN THE ESTATE OF LEWIS SODERLAND.

No. 47129.

(Reported in 30 N. W. 2d 128)

570

DECEMBER 16, 1947.

REHEARING DENIED APRIL 9, 1948.

M. C. Williams, F. W. Ganoe, and E. C. Schroeder, all of Boone, and Emmert, James, Needham & Lindgren, of Des Moines, for appellants.

Doran, Doran & Doran, of Boone, Smedal, Mauer & Clark, of Ames, and E. J. Frisk, of Des Moines, for appellees.

MULRONEY, J.—The will of Lewis Soderland, dated January 12, 1940, provided in part as follows:

"I have heretofore conveyed to my brother Andrew Soderlund approximately 200 acres which was in Garden Township, Boone County, Iowa, and said conveyance was made with the understanding that I should live with my said brother Andrew Soderland without charge for board, lodging and care all the rest of my life if I so desired; and I have also conveyed to my nephew, Martin Soderlund and his wife Myrtle Soderlund the

property where said Martin E. Soderlund and his wife are now living, with the understanding and agreement that I shall have the right to continue to live with them until my death without charge.

"2. I give and bequeath to Orville Soderlund, son of my deceased brother, Charles Soderlund, the sum of Five Hundred ($500.00) Dollars.

"3. I give and bequeath the sum of Five Hundred ($500.00) Dollars to my niece, Myrtle Soderlund a daughter of my deceased brother, Andrew Soderlund.

"4. I give and bequeath the sum of Fifty ($50.00) Dollars to each of my following named nieces, Ethel Frise Anderson, Stella Frise Bengtson, Ruby Frise Frisk, children of my deceased sister, Tillie Frise.

"5. I give and bequeath the sum of Fifty ($50.00) Dollars each to Pearl Alsin Carlson, Ralph Alsin, and Marion Alsin, children of my deceased sister, Mary Alsin.

"6. All the rest, residue and remainder of my estate, real, personal and mixed, of which I die seized or to which I may be entitled, I give, devise and bequeath as follows: An undivided one-seventh (1/7) each to Elmer F. Soderlund, Effie B. Soderlund, Martin E. Soderlund, Mabel Soderlund Finch, Florence Soderlund, and Allen L. Soderlund, children of my brother Jonas Soderlund, and an undivided one-fourteenth (1/14) each to Arlene Soderlund and Jean Soderlund, grandchildren of my said brother Jonas Soderlund.

"7. I hereby nominate and appoint my two nephews, Elmer F. Soderlund and Martin E. Soderlund, to be the joint executors of this my last will and testament, hereby exonerating them from giving bonds for the faithful performance of their duties as such."

When the foregoing will was offered for probate, by the heirs named in clause 6, the devisees named in clauses 2, 3, and 4, who are children of Lewis's deceased brothers and sister, filed objections, alleging the will was the result of fraud and undue influence and that deceased lacked testamentary capacity. The heirs named in clause 6 are the children and grandchildren of Lewis's brother Jonas, who is still alive. In the trial upon

the issues so made the trial court submitted the issue of undue influence and the jury returned a verdict for the contestants. The proponents of the will appeal, alleging sixteen grounds of error, the first raising the sufficiency of the evidence to establish that the will in question was procured by, or was the result of, undue influence. This ground requires a review of the long record. (The family name is called both Soderlund and Soderland.)

Lewis Soderland, a bachelor, died in the Old People's Home in Madrid, Iowa, on July 15, 1946, about five and a half years after the will was executed. At the time he died he had 320 acres of land in Boone county and about $11,000 in cash. There was some dispute in the record as to whether he was ninety-three or ninety years old at the time of his death. He was a man of practically no education. He could not read or write, with exception that he did occasionally sign his own name. His name was signed to the will in question. Up until the year 1916 he lived on what is known in the record as the home eighty, a farm near Slater, Iowa. When his mother, Bertha Soderland, died in the winter of 1915 he moved to his brother Andrew's home in Slater, Iowa, and he lived there for about the next twenty years. His brother Andrew died in March of 1938 and his widow, Minnie, broke up her home in Slater and went to Des Moines to live with her daughter, and Lewis went to the home of his nephew Martin Soderland in Madrid. He continued to live with Martin until the month of December 1944, when he went to the home of Martin's brother Elmer, also in Madrid, where he lived until May of 1945, on which date he was taken to the Old People's Home in Madrid, where he died about fourteen months later.

The Boone attorney who drew and witnessed the will testified that on January 12, 1940, he received a telephone call from Elmer, or his wife, to come and draw the will, and that he and his stenographer drove to the Elmer Soderland home in Madrid. He said that someone (he believed it was Elmer) went after Lewis and that he talked to Lewis about the way he wanted the will and that he then drew the will and read it over to Lewis and Lewis said that was the way he wanted it, and

that they waited around while Elmer went after O. R. Peterson, who was to sign as a witness. When Peterson came, Lewis signed the will, and the attorney, his stenographer and Peterson signed the will as witnesses and the attorney then took the will with him.

On October 19, 1940, Lewis deeded a 200-acre farm to Martin, Elmer and Effie, and on July 2, 1941, he deeded another 120-acre farm to Martin, Elmer and Effie. This comprised all of the real estate Lewis owned. These deeds were notarized by the same attorney that drew the will. It is perfectly clear that Martin, Elmer, Effie and Mabel all knew of the provisions of Lewis's will. Mabel who was left out of the above deeds started a guardianship proceeding against Lewis in 1945 and then settled her differences with her brothers and sister by a strange sort of contract, dictated and prepared by the attorney who drew the will and another Boone attorney representing Mabel. In this contract Elmer and Martin and their sister Effie who held title to all of Lewis's real estate stated that their title was merely in trust so that they could look after the real estate and distribute it under the terms of the will when Lewis died. The contract provided that Martin and Elmer were to relinquish their power of attorney by which they looked after Lewis's property, and O. R. Peterson was to act as trustee and Martin and Elmer were to turn over all funds they then had of Lewis's to Peterson and Peterson was to be the sole judge of the fairness of the accounting and he was to pay the attorney representing Martin, Elmer and Effie, who was the attorney that drew the will, the sum of $300 and Mabel's attorney $500, and this was to be paid from funds turned over to him by Martin and Elmer and to be charged to the interest of all the parties named in clause 6 of the will in the proportion as their interest there appeared. At the time of this contract Lewis was in the Old People's Home. When the contract was executed, Martin, Elmer and Effie executed deeds to the other persons named in clause 6 of the will of fractional interests in the realty, so thereafter the title to Lewis's realty stood in the names of the parties named in clause 6 in the fractional interests there appearing. After the execution of the contract and the recording of the deeds, Mabel dismissed

her guardianship action—though a few days later O. R. Peterson was appointed guardian for Lewis, in apparently a voluntary guardianship proceeding, and Mabel's attorney became attorney for the guardian.

 I. While the question of mental capacity was withdrawn by the court, the mental condition of the deceased has a bearing upon the question of undue influence. As said in In re Estate of Telsrow, 237 Iowa 672, 677, 22 N. W. 2d 792, 796:

"Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind. One who is infirm and mentally weak is more susceptible to influence than one who is not."

Dr. Severson testified that he examined Lewis in October of 1936 and at that time he had a sciatic condition and an infection of the left lung. He took care of him during his attack of pneumonia in April of 1937. He stated that at that time he had a high fever and in addition to the pneumonia condition he stated he had nephritis and his blood pressure indicated arteriosclerosis and cerebrosclerosis or senile dementia. The doctor stated the senile dementia was progressive. The doctor said that in his opinion Lewis's judgment was defective, and that he was not competent to transact business affairs when he saw him in 1937. The doctor saw him again at the Old People's Home during 1945, or the last year of his life, and he said he had progressed considerably in disability. In answer to a hypothetical question the doctor stated that in his opinion a man in Lewis's condition would have been incompetent to transact business on January 12, 1940, the date of the will.

In addition to the doctor's testimony there is other testimony that Lewis failed mentally after his attack of pneumonia. Minnie testified that after his sickness he always depended on someone else to handle his business affairs; that her husband handled his affairs until he became incapacitated and thereafter she handled his affairs until she broke up her home in Slater, but before she left she made arrangements for O. R. Peterson to take care of his affairs and O. R. Peterson acted for him under a power of attorney. The record is clear that Lewis

could not read and the testimony shows that he did not ever talk over a telephone and he did not ever drive an automobile. Witnesses said that after he got to Martin's home he got old and childish and what he said did not mean anything. Under the whole record, the jury would have been warranted in concluding Lewis was mentally weak at the time the will was executed.

The record shows that there was abundant opportunity to exercise undue influence in this case. Shortly after Lewis came to Martin's home to live, Martin and Elmer obtained a power of attorney from him, and Peterson testified their appointment was at his suggestion and that he destroyed the power of attorney under which he had been acting. They had complete charge of all of his property. He was living in Martin's home. There is no question but that he was absolutely dependent upon his appointed attorneys in the transaction of his business affairs. His inability to read, his inability to talk over the telephone, his inability to drive an automobile, and his advanced age, made him dependent upon those charged with exerting undue influence. It is clear from the record that Lewis could not in his condition have made the necessary preparations for the execution of a will. The preparations had to be made for him just as he had to have help in other business transactions. There is no showing that he had any independent advice or help. The attorney who drew the will was a stranger to Lewis. He had never done any legal work for Lewis and he was called by Elmer or his wife to come to Elmer's home to draw the will.

The opportunity to exert undue influence was present and the jury could find there was a disposition on the part of Martin, Elmer and Effie to exert undue influence. Minnie testified that Martin, Elmer and Effie came to her home two or three times after Lewis recovered from the pneumonia and that they talked to Lewis in her presence and told Lewis he should sign over his property to avoid inheritance tax, and that Martin took him outside the house and talked to him alone and later Lewis told her that he had asked him or told him to make out some papers and deed his land to them because they

said if he did not there would be taxes to pay when he died. She said that he was nervous and excited after these conversations, and that he said "No" and "That's mine." Both Martin and Elmer were witnesses for the proponents but they were not asked concerning these visits.

The taking of the deeds and the difficulties that arose between the proponents, which were settled by the contract, exhibited the desire of the proponents to get Lewis's property, even before he died. There was some evidence of surveillance by some of the proponents, exercised over Lewis when he was living at Martin's home, and evidence of statements made by Lewis after he was in the Old People's Home to the effect that Elmer and Martin did not care anything about him but were fighting over his money. A tenant on one of the farms testified to conversations with Lewis, sometime after Lewis had moved to Martin's home, where he said: "* * * they [Martin, Elmer and Effie] want my money," and that Lewis said this on more than one occasion.

The jury could find that the will was unnatural and unjust and that it tended to confirm the charge of undue influence. Minnie testified her husband, Andrew, died leaving 193 acres and that no part of it came from Lewis. She denied the statement in the will that Lewis had given her husband, Andrew, approximately 200 acres with the understanding that he could live with Andrew the rest of his life without charge. She stated Andrew had 80 acres before she married him and that they were in partnership on later land deals but they settled up and Lewis did not give Andrew any land. There was no explanation of the statement in the will that he also gave Martin a house with the same understanding that he would have the right to live with Martin for the rest of his life without charge. He died in an old people's home. There was evidence that his relationship with all his nieces and nephews was friendly. There was some testimony by the proponents to the effect that he was mad at some of the contestants because they opposed his claim in his mother's estate many years ago. The proponents, with Jonas living, would take nothing if Lewis died without a will and there was testimony that Lewis was not on speaking terms with his brother Jonas. Lewis lived in the Andrew

Soderland household for twenty years. Andrew's two daughters, Fern and Myrtle, gave up their bedroom to Lewis when he came to their home and thereafter slept in the living room or dining room of the five-room home. The evidence is clear that Lewis was happy in this home and in later years he wished he could go back to live in Slater. He was treated as a member of the family and the daughters, Fern and Myrtle, and their mother, Minnie, waited on him and nursed him through his periods of sickness. And yet, the will leaves $500 to Myrtle and Fern is not even mentioned in the will.

■ As we view the entire record the court was right in submitting the issue of undue influence to the jury. The evidence would warrant a finding that the testator was subject to undue influence; that there was both opportunity and disposition to exercise such influence; and that the will appears to be the result of such undue influence. See In re Estate of Telsrow, 237 Iowa 672, 22 N. W. 2d 792, and cases there cited.

■ II. One of the errors asserted is the alleged misconduct of attorney for the contestants in argument to the jury. The argument was not taken down by the court reporter and the matter was presented by affidavits of attorneys and bystanders who heard the arguments. No proposed bill of exceptions was presented to the trial court as contemplated by Rule 241(c), Rules of Civil Procedure. The trial court in denying proponents' motion to settle a bill of exceptions stated:

"Proponents seem to have in mind that the Court should take the four affidavits which they have filed, and that a summary thereof be prepared by the Court and a certification made thereof. The arguments in this case lasted for almost a day and a half, and it is obvious that no one could remember all that was said by counsel on both sides in their arguments, nor the manner in which it was said, nor the context of the statements, and in what manner, if at all, any statement was responsive to previous arguments.

"Rule 241 seems to contemplate that the parties themselves shall prepare a bill of exceptions, and support each exception by affidavit. The procedure requested by proponents puts

the Court in an impossible situation, since, in the absence of any objection being made at the time of the alleged misconduct, and a record thereof made, it is beyond the power of this Court to recall all that was said so that a fair picture thereof may be given to the higher court for review."

The trial court was right. The record shows nothing to review in the assigned error. As bearing thereon see Connelly v. Nolte, 237 Iowa 114, 21 N. W. 2d 311.

III. During the trial a certain deposition made by the deceased a few months before he died was offered in evidence by the proponents. The deposition was made under an order of court in an action brought by Pearl Alsin Carlson to set aside the deeds to Lewis Soderland's property previously mentioned. The trial court was right in excluding this deposition. It is the general rule that depositions in one suit are admissible in another suit involving the same subject matter between the parties or those in privity with them. 26 C. J. S., Depositions, section 98. All of the contestants were not parties in the action to set aside the deeds and they were not all served with notice of the taking of the deposition but it might be argued they were all in privity with plaintiff in that suit. But here the same subject matter was not involved. The issues were not the same. That was an action to set aside deeds. This is an action to set aside the will. The deposition was not admissible. Fosston Mfg. Co. v. Lemke, 44 N. D. 343, 175 N. W. 723; Hartford v. Pinnie, 128 Neb. 771, 260 N. W. 371.

Moreover, the record shows the trial court did allow most of the contents of the deposition, since one of the proponents' attorneys who participated in the taking of the deposition was allowed to testify as to the statements and answers to questions made by Lewis at the time of the taking of the deposition. He practically read Lewis's answers from the deposition which he had in his hands while a witness, and which he used to refresh his recollection.

IV. Appellants assert error in the trial court's failing to exclude the testimony of Minnie to the effect that Lewis told her, after the visits of Martin, Elmer and Effie to her home when they talked with Lewis, that they had asked him or

told him to deed his land to them to avoid inheritance taxes. It is true, as appellants argue, that these statements were hearsay and as such they were ineffective as substantive proof that Martin, Elmer and Effie exerted undue influence upon the testator but the declaration of the decedent was admissible as bearing upon his state of mind. Minnie's further testimony that she told him "if he signed deeds he wouldn't have any land", and his reply: "That's mine", and that he was nervous and excited after these conversations with Martin, Elmer and Effie was also admissible. We said in In re Estate of Champion, 190 Iowa 451, 457, 180 N. W. 174, 177:

"* * * declarations made both before and after the execution of a will may be admissible as bearing upon the state of testator's mind, and may be considered upon the issue as to whether he had, in fact, been influenced. * * * Zinkula v. Zinkula, supra [171 Iowa 287]; Graham v. Courtright, 180 Iowa 394."

In Stephenson v. Stephenson, 62 Iowa 163, 165, 166, 17 N. W. 456, 457, the contestants introduced the testimony of deceased's widow that a day or two after the execution of the will the testator told her: " 'They got around me and confuddled me. It [the will] is to be done over again.' " We held the testimony admissible, stating:

"* * * that the declarations of the testator may be received, not as showing undue influence, but as showing the effect on his mind of whatever undue influence, if any, was exerted upon him to procure him to execute the will."

See, also, In re Estate of Hollis, 234 Iowa 761, 12 N. W. 2d 576.

The trial court in its instructions told the jury that the evidence of declarations of deceased was to be considered by the jury "only as bearing upon the state of mind of the decedent at the time the instrument in question was executed." No requested instructions were made.

Appellants argue that if this evidence is admissible it is only corroborative testimony and since it is not substantive proof that Martin, Elmer and Effie exerted undue influence,

in keeping record with no substantive evidence of undue influence exerted by them or no proof of the matter to be corroborated. But this overlooks the fact that here, as in most cases involving undue influence in the execution of a will, the proof of undue influence is by circumstantial evidence. The evidence is proof of the testator's state of mind—one of the circumstances.

V. Appellants predicate error on the rulings of the trial court where admissions and declarations of one of the several beneficiaries were admitted in evidence over their objections. They argue the general rule that declarations and admissions of one of several beneficiaries are not admissible where the declarations of one might operate to the prejudice of the others and their interest is not joint. In re Estate of Hollis, 234 Iowa 761, 12 N. W. 2d 576, and cases cited. The assignment points first to the evidence of declarations made by Martin, or Martin, Elmer and Effie in their visits to Minnie's home when they talked to Lewis about deeding his property to them and the deeds, power of attorney, and the guardianship proceedings started by Mabel and the contract that settled the guardianship suit. But in this case it is the declaration of the deceased that was admitted and we have held this was proper, not as proof of undue influence but as proof of his state of mind. It is true that Minnie did testify to statements made by Martin, Elmer and Effie to Lewis in her presence and Lewis's answers. Lewis's answers and declarations were admissible. The questions that preceded the answers were necessary to give meaning to the answers, for the statements made by Lewis were "No" and "That's mine." But in any event, under the record in this case these statements and admissions together with the power of attorney, all the deeds later acquired, and the testimony concerning the bringing and dismissing of the guardianship action by Mabel and the contract and deeds that settled that case were all admissible as against all of the proponents. They all held deeds to all of his realty, before he died, in the proportions set forth in paragraph 6 of the will. While there was testimony that some, but not all, asked him to make deeds, and some, but not all, received deeds from Lewis, and

one started the guardianship action that was settled by a contract that referred to the will, signed by some, but not all, still the final result was a series of conveyances that placed the title to all of Lewis's realty in all the proponents under a contract that mentioned all the proponents and the very will here involved. All of the proponents were more or less linked together, or at least the jury could have inferred that those who received conveyances of the realty before Lewis died, in the proportions set forth in the will, were together from the start. As bearing thereon, see Cash v. Dennis, 159 Iowa 18, 139 N. W. 920; Ex Parte McKie, 107 S. C. 57, 91 S. E. 978.

One other bit of testimony consisting of declarations of Martin and Elmer is referred to under this assignment of error. A Mrs. Ryan testified that when Lewis was staying at Elmer's house not long before he went to the Old People's Home, she visited him and he told her she could have an old bed that was in the storeroom at the old home place and that the next day Martin and Elmer drove to her home and told her to leave the bed where it was "until things get settled" and that they wished she would not talk to Lewis as he "gets to talking about his troubles" and becomes "unruly." These statements were made while Martin and Elmer had charge of all of Lewis's property, both real and personal, under a power of attorney from Lewis. They had charge of all his affairs. There was no reversible error in the court's ruling admitting the statements.

VI. There is no merit in appellants' assignment of error based on the trial court's overruling their motion that certain contestants be required to withdraw from the case. The motion was made after proponents introduced a prior will in which these contestants were not named as beneficiaries. The argument of appellants is that the setting aside of the will in controversy would not result in intestacy but distribution would be under the prior will and, since some of the beneficiaries were not named in the prior will, they would not be benefited by the setting aside of the last will, and therefore they have no contestable interest in this will contest as to the last will. The prior will was introduced by the proponents. The record shows that the attorney who drew the last will in Elmer's home

destroyed still another will at that time. There would be a serious question as to whether the prior will that was introduced in evidence was unrevoked. As bearing thereon, see In re Estate of Farley, 237 Iowa 1069, 24 N. W. 2d 453.

VII. The remaining assigned errors have to do with the instructions to the jury. The record shows a preliminary draft of the instructions was handed to counsel for appellants and that counsel filed with the court their "Exceptions to Court Instructions"; that thereafter certain changes were made in the instructions to meet certain objections made by proponents. The trial court certified that before the final draft was read to the jury counsel for proponents and contestants were asked if they wished to take exceptions to the final draft which had previously been submitted to them for examination and it was its understanding that both counsel stated they desired no exceptions and none was dictated into the record and the court made a calendar entry that "counsel for both proponents and contestants take no exception to the final draft of the instructions which the Court had previously submitted to them." The court further certified that counsel for proponents may have intended that the written exceptions which had previously been handed to the court should apply to the final draft but that it did not so understand it at the time.

Objections should be made to the "instructions in their final form" if they are to be considered on appeal. Rule 196, Rules of Civil Procedure. They must be made in writing or dictated into the record. Because there might have been some misunderstanding in this case we have examined the assignments of error based upon the instructions given, in the light of the exceptions to the instructions filed before the final draft was submitted to proponents' counsel. We find no reversible error in these assignments. No written requested instructions were filed and the complaints as to instructions given were that they (1) invited the jury to apply the doctrine of natural justice (2) gave an erroneous and improper definition of undue influence, and (3) that the court erred in using the language of plaintiffs' petition in an instruction. The first is an attack on instruction No. 11. The instruction is too long to set forth

584

herein, but our reading of the instruction leaves no impression that the jury was invited to apply the doctrine of natural justice. It fairly tells the jury the matters they can consider, such as the testator's state of mind; confidential and fiduciary relation and all the other elements, in determining whether or not the will was the product of undue influence. Part of this instruction was changed in accordance with plaintiffs' objection to the instruction as it appeared in the preliminary draft.

The objection to the instruction defining undue influence is that the court said: "It must be such as to overcome the will of the testator and to destroy, *to some extent at least,* his free agency." The objection is to the italicized portion. When the instruction is considered as a whole, we feel the objection is without merit. The instruction states the undue influence must be equivalent to moral coercion and must be such as to dominate and control the mind of the testator and by fraud, deceit or coercion induce him to make a will different in some essential provisions from what he would have made if he were a free agent. It cautioned the jury that the mere fact the disposition was unreasonable would not alone establish undue influence nor would the fact that it was prompted by influence acquired by business confidence or affectionate regard be sufficient to establish undue influence. We think the instruction was proper. See McIntire v. McConn, 28 Iowa 480; Mallow v. Walker, 115 Iowa 238, 88 N. W. 452, 91 Am. St. Rep. 158.

The last criticism of the instructions to the effect that the trial court adopted the language of the petition in instruction No. 1, in stating the issues, is also without merit. Moreover, we do not find this objection in the exception to the instructions which proponents filed.

Finding no error, the cause is affirmed.—Affirmed.

OLIVER, C. J., and BLISS, HALE, GARFIELD, SMITH, and HAYS, JJ., concur.