REGAL INSURANCE COMPANY, a Louisiana Corporation, and Regal Group, Inc., a Nevada Corporation, Appellants,

v.

SUMMIT GUARANTY CORPORATION, a Delaware Corporation, Appellee,

and

FIRST INTERNATIONAL ASSURANCE CO., LTD., a Bermuda Corporation, Intervenor-Appellee,

v.

REGAL GROUP, INC., a Nevada Corporation, Regal Insurance Co., a Louisiana Corporation, Roger Williams Insurance Co., a Louisiana Corporation, and Summit Guaranty Corporation, a Delaware Corporation, Appellants and Appellees.

No. 66548.

Supreme Court of Iowa.

Sept. 29, 1982.

Rehearing Denied Oct. 21, 1982.

Lawrence L. Marcucci and David P. Jennett of Williams & LaMarca, P. C., West Des Moines, for appellants.

Fred L. Dorr of Wasker, Sullivan & Ward, Des Moines, Michael J. Murphy of Lord, Day & Lord, New York City, and

David L. Phipps of Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for appellees.

Considered by REYNOLDSON, C. J., and HARRIS, McCORMICK, LARSON, and SCHULTZ, JJ.

HARRIS, Justice.

The trial court sustained a challenge to the transfer of 15,000 shares of preferred corporate stock and entered judgment on a $295,000 note. A constructive trust was imposed. On appeal we reject various challenges to these determinations and affirm the trial court.

The case arises from complex corporate legal maneuvers by which the 15,000 shares of defendant Summit Guaranty Corp. (Summit) preferred stock were transferred from a corporation which owned them to a second corporation, and then to a third. Summit is a Delaware corporation with its principal place of business in Des Moines. Plaintiff-intervenor First International Assurance Co. (FIAC) (which originally owned the 15,000 shares) was an insurance company organized under the laws of Bermuda with offices in Los Angeles. Plaintiff Regal Group (Regal) is a Nevada corporation. Plaintiff Regal Insurance Co. (Regal Insurance) and defendant-intervenor Roger Williams Insurance Co. (Roger Williams) are Louisiana corporations. Both Regal Insurance and Roger Williams are subsidiaries of Regal. Regal, in turn, is wholly owned by Mr. Robert Meester.

Because the same persons served similar positions in the various corporations the names of officers and directors are important. In 1975 FIAC's officers and directors were Milton Polland (chairman of the board), Charles Cipolla (president and director), and Walter Plischke (secretary, treasurer and director). FIAC had ceased writing insurance. Creditors claimed about ten million dollars against FIAC but its tangible assets consisted only of $300,000 cash and the 15,000 shares of Summit preferred stock.

In November of 1975 the officers and directors of FIAC (Polland, Cipolla, and Plischke) formed a Nevada corporation, Global Corp. (Global), and installed themselves as its officers and directors. The reason for this is apparent. Plischke, the treasurer of FIAC, testified that FIAC was "for all intents and purposes bankrupt" and the formation of Global was seen as a way for the officers and directors of FIAC to maintain a viable company.

The three principals, Polland, Cipolla, and Plischke, now sitting as officers of both corporations on August 31, 1975, transferred $295,000 from FIAC to Global in exchange for a promissory note signed for Global by Polland and Cipolla. On March 29, 1976, Polland, Cipolla, and Plischke caused FIAC to transfer its remaining asset, the 15,000 shares of Summit stock, to Global. FIAC received nothing in return. FIAC was thus stripped of cash and stock holdings and went into liquidation. It intervened in this action to reclaim its assets.

In March of 1976 Global used $150,000 of the money thus acquired to purchase 100 percent of the stock of Roger Williams, a small Rhode Island insurance company. To finance this $450,000 acquisition, Global also had to borrow $300,000 from the Security Pacific National Bank of San Francisco. The 15,000 Summit shares previously transferred from FIAC were used as collateral for the loan. Polland, Cipolla, and Plischke then installed themselves as the officers and directors for Roger Williams.

Joining as participant was Robert Meester, a bail bond broker, who desired an influential position in an insurance company. As mentioned, FIAC had been an insurance company until Polland, Cipolla, and Plischke abandoned it and formed Global. Global was not an insurance company; it was merely a corporation formed to acquire an insurance company for the principals of Global and FIAC to run. In casting about for ways to finance the acquisition of Roger Williams the three were introduced to Meester in the fall of 1975.

Meester signed a March 16, 1976, letter of agreement with Cipolla in which Meester

would provide $200,000 to $300,000 for the purchase of Roger Williams in exchange for a strong position in either Roger Williams or Global. A contract to this effect, however, was not signed. So, on March 29, 1976, the Global principals reached into FIAC and took the 15,000 shares of Summit stock so that Global could acquire Roger Williams.

In September of 1976, six months after Global's acquisition of Roger Williams, Meester became an officer and director of both Global and Roger Williams. In December of 1976 Meester transferred his wholly-owned bail bond agency, Surety Control General Agency, Inc., to Global in exchange for a 65 percent interest in Global. As part of this agreement Global unilaterally agreed to cancel the $295,000 note to FIAC, thereby decreasing Global's liabilities from $595,000 to the $300,000 owed to Security Pacific National Bank. In return for the cancellation of the $295,000 note FIAC was to receive a new issue of Global preferred stock worth $150,000, about half the value of the note. In spite of the agreement FIAC never received any cash or stock from Global.

Sometime in early 1977 Meester, now a 65 percent owner of Global, decided to shift Roger Williams' corporate domicile from Rhode Island to Louisiana. In order to do so Louisiana authorities required the deposit of a certain amount of corporate assets and Roger Williams was insufficiently capitalized to meet the requirements. The problem was solved by having Global transfer the Summit shares to Roger Williams. These were the shares being held as collateral by Security Pacific Bank. Meester, acting for Roger Williams, removed the stock certificates from the bank and, after noticing the stock was registered in FIAC's name (Plischke, as treasurer of FIAC, had endorsed them to Global), deposited all 15,000 shares with the Louisiana insurance commission. In return for the Summit stock it received from Global, Roger Williams purportedly issued 45,000 shares of its own stock to Global, even though Global already owned 100 percent of the Roger Williams stock.

Robert Meester, now firmly in control in Global and Roger Williams, formed a wholly-owned Nevada corporation in November of 1977 named the Regal Group (Regal), appellant here. He then caused Global to transfer its Roger Williams subsidiary to Regal. The reason for this transfer seems obscure because Roger Williams promptly stopped writing insurance. For its part, Regal was to assume Global's $150,000 obligation to FIAC for the intended issuance of the preferred stock. That obligation, noted earlier, arose from cancellation of the $295,000 note by Global. It is to be remembered that nothing was ever paid to FIAC.

In April of 1979 Regal, now the parent of Roger Williams, formed a Louisiana subsidiary named Regal Insurance Co. (Regal Insurance), appellant here. Regal later tried to merge Regal Insurance with Roger Williams, but that merger was declared void by the Louisiana courts. *See Louisiana Insurance Guaranty Assoc. v. Bernard,* 393 So.2d 764, 771 (La.App.1980).

In March of 1979 FIAC was placed in compulsory liquidation by the Supreme Court of Bermuda and a liquidator was appointed to marshal FIAC's assets and pay off its creditors. When the liquidator sought to recover the Summit stock (still registered to FIAC) he encountered stiff opposition from Meester and Regal Insurance. Regal Insurance by that time was itself trying to redeem the stock from Summit. Summit prudently refused to redeem the stock for Regal Insurance unless FIAC first released its claim to it. In an effort to persuade FIAC's liquidator that Regal Insurance or Roger Williams owned the Summit stock Regal produced an attorney's opinion and affidavit from Global's president, Cipolla.

According to these documents Global had acquired the Summit stock from FIAC for good consideration—the $295,000 note of August 31, 1975. Hence, the documents asserted, the subsequent merger of Regal Insurance and Roger Williams made Regal the true owner of the stock. When Summit remained unconvinced Regal Insurance

filed this action to force Summit to change the owner's name on the shares[1] from FIAC to Regal Insurance.

In its petition, Regal Insurance asserted ownership of the Summit stock by virtue of its merger with Roger Williams. The petition failed to disclose that the merger had been voided by the Louisiana courts only six months earlier. Regal Insurance also sought and received an order requiring FIAC's liquidator to appear and show cause why FIAC, and not Regal Insurance, was the true owner of the Summit stock.

The liquidator appeared and intervened in the action, asserting three claims against both Regal Insurance and Roger Williams. It was first claimed that FIAC, not Regal Insurance or Roger Williams, was the owner of the Summit stock. Secondly, it was claimed FIAC was entitled to a judgment on its promissory note of $295,000. Finally, it was claimed that, since FIAC's assets had been wrongfully used to acquire Roger Williams, a constructive trust of Roger Williams should be declared in favor of FIAC. Regal Group, the parent of Regal Insurance and Roger Williams, subsequently joined the action voluntarily as plaintiff (and as defendant with respect to FIAC's petition).

■ The trial court found FIAC's claim to the Summit stock was superior to that of Roger Williams. It further found FIAC was entitled to recover $295,000 from Regal. The court also imposed a constructive trust on Roger Williams in favor of FIAC.[2]

■ I. Under Iowa Code § 554.8315 (1981) FIAC may reclaim the disputed shares of stock from anyone but a bona fide purchaser if it can show the transfer was wrongful. The first question then is whether the transfer from FIAC was wrongful. The appellants, Regal, Regal Insurance, and Roger Williams, argue the transfer cannot be deemed wrongful because the FIAC liquidator was unable to show that FIAC was insolvent at the time, thus intending to defraud its creditors. Appellants insist that insolvency at a given time can be proven only by books and records of a company. FIAC did not produce any such evidence but instead introduced testimony of Plischke and Cipolla. The two testified that in 1975 FIAC faced claims in excess of $10,000,000 and possessed only two assets: $300,000 cash and the 15,000 shares of Summit stock worth $20 per share. The trial court found this to constitute insolvency.

Although the record easily supports a finding of insolvency we choose to subscribe to the trial court's finding of wrongfulness on an alternative, disputed ground: the transfer operated as a fraud and deceit upon FIAC's creditors.

The record here indicates that the principals of FIAC saw claims accumulating and wished to salvage whatever they could from a desperate situation. Hence, they quickly formed a temporary repository (Global) for FIAC's assets and transferred all of FIAC's cash to it in return for the note. Seven months later, when they needed additional

1. It is unimportant that 12,500 shares, only, were involved in the claim at this point; 2500 shares were changed September 9, 1976. For simplicity we treat the 15,000 shares together.

2. The trial court also held Meester in contempt and fined him $250. This resulted from violation of an injunction which restrained Meester and others from transferring or secreting assets "previously or formerly held" by Roger Williams. Meester violated the injunction in Rhode Island.

A fund was set up in Rhode Island for Roger Williams' creditors at the time the change of Roger Williams' domicile was sought to Louisiana. By misrepresentation to the custodian of the trust funds, Meester's counsel secured for Roger Williams two check amounting to $195,-

000. One hundred sixty-eight thousand dollars was however recovered because payment on one of the checks was stopped when the misrepresentation was discovered. Only partial recovery was had on the second check.

A review of the contempt finding was not stated as an issue for review under Iowa R.App.P. 14(a)(3). In a reply brief appellants mention, in argument, that we should review the contempt finding. Because no grounds for the request are stated, and no authorities are cited, the request is not sufficient. *Matter of Estate of Dull*, 303 N.W.2d 402, 407 (Iowa 1981). Because the request is first made in the reply brief it is not timely. *State v. Willet*, 305 N.W.2d 454, 458 (Iowa 1981). We give the request no further consideration.

capital to acquire Roger Williams, the officers and directors of FIAC (who were also the officers of Global) simply took the stock from FIAC.

■ We have long presumed the transfer of property without consideration to be fraudulent. Any such transfer may be set aside by the grantor's creditors (here FIAC's liquidator) unless the transferee (here Global or Roger Williams) is able to prove the grantor remained solvent after the transfer. *McCoy v. Martin,* 257 Iowa 146, 148–49, 131 N.W.2d 783, 784 (1964); *Commercial Sav. Bank v. Balderston,* 219 Iowa 1250, 1256, 260 N.W. 728, 731 (1935). It seems that neither actual dishonesty nor intent to deceive are required for a showing of constructive fraud. 37 C.J.S. Fraud § 2(c); 37 Am.Jur.2d, Fraud and Deceit, § 4 at 23. We have found, upon our de novo review of the facts, that the transfer here was without consideration. This was also the trial court's finding and is bolstered by the fact that the appellants made no effort at trial to prove FIAC remained solvent after the transfer.

II. Iowa Code § 554.8315 creates an exception from its general application for bona fide purchasers so the question arises whether there is one here. A bona fide purchaser (BFP) is defined in Iowa Code § 554.8302 as ". . . a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or endorsed to him or in blank."

Iowa Code § 554.1201(44) defines value:
Except as otherwise provided . . . a person gives "value" for rights if he acquires them

. . . .

d. generally, in return for any consideration sufficient to support a simple contract.
Good faith means "honesty in fact in the conduct or transaction concerned." Iowa Code § 554.1201(19). Adverse claim, according to section 554.8301(1), "includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security." The parties suggest several possible BFPs. We agree with the trial court that none qualify.

■ The Security Pacific National Bank surely does not qualify because to do so it must have taken the stock as collateral without notice of FIAC's adverse claim. But the evidence suggests that the bank knew the Global principals were also FIAC principals and knew that Global's purpose was to acquire Roger Williams. When the bank received the stock it could see it was registered in FIAC's name. There is no realistic way to believe the bank took the stock without notice of FIAC's interest. See Iowa Code § 554.8304(2).

■ Robert Meester does not qualify as a BFP either. Appellants maintain Meester individually, rather than Roger Williams, was the purchaser of the Summit stock and that he had no reason to be on notice of the adverse FIAC claim. The evidence is otherwise. The transfer of the Summit stock was between Global and Roger Williams and the documents suggest no individual participated. Having adopted the corporate form Meester cannot disregard it at will to avoid some disadvantage that goes with it. *Inn Operations, Inc. v. River Hills Etc. Co.,* 261 Iowa 72, 83, 152 N.W.2d 808, 815 (1967). Property acquired by a corporation belongs to the entity, not its stockholders. *Johnson Cty. v. Guernsey Ass'n of Johnson Cty.,* 232 N.W.2d 84, 86 (Iowa 1975); 1 Fletcher, *Cyclopedia of the Law of Private Corporations,* § 31 at 132 (Perm ed. 1974).

■ Roger Williams cannot qualify as a BFP because it took with notice of FIAC's claim and also because it did not take the Summit stock for "value" as required by Iowa Code § 554.8302. Both Polland and Plischke were officers and directors of Global at the time of the transfer. Plischke was also an officer and director of Roger Williams. Polland and Plischke were both involved in the wrongful transfer from FIAC to begin with. As a general proposition knowledge or notice of

an officer-director of a corporation is imputed to the corporate entity even if it is never actually disclosed to the corporation. *See Rohlin Const. Co., Inc. v. Lakes, Inc.,* 252 N.W.2d 403, 405 (Iowa 1977). Appellants seek to avoid the force of the imputation rule by suggesting this case falls under an exception. Notice to an officer or director is not imputed to the corporate entity where the officer is acting in conflict with or to the detriment of the corporation. *See Clapp v. Wallace,* 221 Iowa 672, 677, 266 N.W. 493, 495 (1936). For example, corporate officers' knowledge of fraud against their own corporation, where the officers participate in the fraud, is not considered notice to the aggrieved corporation. *Charles v. Epperson & Co., Inc.,* 258 Iowa 409, 426, 137 N.W.2d 605, 615 (1965). But the facts here do not qualify for the exception. Here the transfer of the Summit stock to Roger Williams was undertaken to enable Roger Williams to establish corporate domicile in Louisiana where it was hoped business would be better. It cannot be said that Plischke was acting contrary to the interest of Global in transferring the stock from FIAC. *See Funk v. Tifft,* 515 F.2d 23, 26 n.4 (9th Cir. 1975) (exception applies only if officer is defrauding or stealing from the corporation).

Roger Williams does not qualify as a BFP for an additional reason. It did not take the Summit stock for value within the meaning of Iowa Code § 554.8302. Global owned 100 percent of Roger Williams before the transfer. After the transfer Global still owned 100 percent. Global purportedly received 45,000 shares of Roger Williams stock for the Summit stock. But this cannot be called value because the percentages of ownership were unaffected. *Cf. Eisner v. Macomber,* 252 U.S. 189, 211, 40 S.Ct. 189, 194, 64 L.Ed. 521, 530 (1920) (distribution of additional shares as stock dividend not income to shareholder).

III. As an alternative defense appellants argue that FIAC should be barred from recovering the stock under the equitable doctrine of laches. They point out it was five years after the transfer before any recovery was sought, a delay which they say was simply too long. Under the laches doctrine relief is denied when it appears from the surrounding facts and circumstances that anyone seeking relief has been guilty of unconscionable delay. But the doctrine "pertains to delay in asserting or prosecuting a claim to the disadvantage or prejudice of another." *Holden v. Constr. Mach. Co.,* 202 N.W.2d 348, 356 (Iowa 1972).

Laches does not apply where the delay is induced by the one seeking to invoke the doctrine. To bar recovery on the basis of laches because of a defendant's own concealment or misrepresentation would unjustly pin the responsibility for delay on the wrong party. *Id.* The doctrine is applied to do, and not to defeat, justice; it will be applied "only where it would be inequitable to permit recovery or it is clearly demanded in the interest of justice. Each case is governed chiefly by its own circumstances." *Shives v. Niewoehner,* 191 N.W.2d 633, 637 (Iowa 1971).

We agree with the trial court in holding the doctrine inapplicable here. Meester sought to mislead the liquidator on FIAC's right to the Summit stock. His "unclean hands," under *Holden,* deny him access to the doctrine of laches. Moreover, the liquidator was not idle for five years. His knowledge of the fraudulent conveyance was only recently acquired. *Cf. Schmidt v. Schurke,* 238 Iowa 121, 125–26, 25 N.W.2d 876, 879 (1947) (complainant must delay in asserting his rights with knowledge or notice of the conduct that gives rise to his cause of action).

IV. Another assignment challenges the trial court's imposition of a constructive trust. A constructive trust is a remedy, applied for purposes of restitution, to prevent unjust enrichment. It is an equitable doctrine. In *Loschen v. Clark,* 256 Iowa 413, 419, 127 N.W.2d 600, 603 (1964), we approved the following definition:

A constructive trust is a creature of equity, defined ... as a remedial device by which the holder of legal title is held to be a trustee for the benefit of another

who in good conscience is entitled to the beneficial interest. So, the doctrine of constructive trust is an instrument of equity for the maintenance of justice, good faith, and good conscience, resting on a sound public policy requiring that the law should not become the instrument of designing persons to be used for the purpose of fraud.

*E.g.,* Hillman, *Contract Remedies, Equity, and Restitution in Iowa,* § 3.3 at 63–68 (1979); *Restatement of Restitution,* § 160 (1937); 89 C.J.S. Trust § 151 at 1066–68; 76 Am.Jur.2d, Trusts, § 221 at 446.

Constructive trusts fall into three categories: (1) those arising from actual fraud; (2) those arising from constructive fraud (appropriation of property by fiduciaries or others in confidential relationships); and (3) those based on equitable principles other than fraud. *Loschen,* 256 Iowa at 419–20, 127 N.W.2d at 603; Hillman, *supra,* at 64. One seeking the remedy must establish the right by clear, convincing, and satisfactory evidence. *Copeland v. Voge,* 237 Iowa 102, 107, 20 N.W.2d 2, 5 (1945).

The stakes are high. The person in whose favor a constructive trust is established may "trace" property to where it is held, and is entitled to reach whatever has been obtained through the use of it, in addition to profits or income generated by its use. *See Holden,* 202 N.W.2d at 358; *State v. Hawkeye Oil Co.,* 253 Iowa 148, 158–59, 110 N.W.2d 641, 647–48 (1961); Hillman, *supra,* at 66–67; *Restatement of Restitution,* § 202 (1937). Finally, where subsequently acquired property is transferred to another who takes it with notice of the original wrong, the transferee holds it subject to the claims of the original owner. *Restatement of Restitution,* §§ 168(2), 201(1); § 168, comment c (1937).

Appellants argue that the liquidator has not met his burden by clear, convincing, and satisfactory evidence. On the basis of *Newell v. Tweed,* 241 Iowa 90, 96, 40 N.W.2d 20, 24 (1949), they argue actual fraud must be shown. But *Newell* must be read in the light of our subsequent holding in *Loschen* where we quoted with approval from *Homolka v. Drahos,* 247 Iowa 525, 529, 74 N.W.2d 589, 591 (1956): "A constructive trust is an appropriate remedy against unjust enrichment whether initially tainted with fraud or not." 256 Iowa at 419, 127 N.W.2d at 603. We find that FIAC has more than met its burden.

Meester's Regal Group acquired Roger Williams with notice of the wrongful transfer of stock from FIAC. The acquisition of Roger Williams by Regal was not really a business transaction; it was a mere buy-out of Polland and Plischke and an attempt to avoid Global's creditors.

The evidence that Meester knew of the original wrongful transfer of stock from FIAC easily qualifies as clear, convincing, and satisfying. Meester's own testimony was conflicting. He several times testified that he had not heard of Global until late in 1976 so that he could not have known of Global's March 29, 1976, acquisition of Roger Williams. But on cross-examination it was disclosed there was a letter March 16, 1976, from Cipolla as president of Global to Meester which mentioned Global's acquisition of Roger Williams. As of then Meester knew Global was trying to acquire Roger Williams and could not finance the acquisition by itself. Meester himself was asked to contribute $200,000 to $300,000.

One year later, in March of 1977, Meester himself removed the Summit stock from Pacific Security National Bank and observed FIAC's name on the certificates. The certificate showed that Plischke as an officer of FIAC had endorsed the stock to Global. Meester knew that Global's and FIAC's principals were the same, and that Global had used the Summit stock to borrow money from the bank in March of 1976. This was the same month that Meester had been solicited to help Global's financing of Roger Williams. Nine months later Meester caused Global to transfer Roger Williams to Regal. The trial court was right in rejecting Meester's claim he was unaware of the wrongful transfer.

V. The trial court held Regal liable to FIAC on Global's $295,000 promissory note,

dated August 1975.[3] The trial court found that Meester, as officer and director of Global, participated in a fraudulent cancellation of the $295,000 note and, because Meester was the incorporator and controlling shareholder of Regal, Regal was liable under the tort theory of interference with contract. *See* Prosser, *Law of Torts,* § 129 et seq. (4th ed. 1974). The trial court ordered Regal to pay FIAC the $295,000 sum.

Appellants argue that the liquidator's claim to the $295,000 is barred by the five-year statute of limitations. Iowa Code § 614.1(4). Appellants point out that FIAC's other creditors began pursuing FIAC's assets in May of 1975 and insist that the liquidator had notice of the company's troubles. They correctly note that a creditor's rights are no greater than the corporation's. *See* 19 Am.Jur.2d, Corporations, § 1454 at 843; 19 C.J.S. Corporations § 1505 at 1222–23.

The liquidator argues that the five-year limitation did not run until Meester participated in the cancellation of the debt in December of 1976, keeping the action viable until December of 1981. The liquidator maintains the statute could not begin to run in August of 1975 (when the $295,000 was taken from FIAC) because the knowledge of Cipolla and Plischke cannot be imputed to FIAC; FIAC was itself the victim of the fraud. *Des Moines Bk. & Tr. Co. v. Bechtel & Co.,* 243 Iowa 1007, 1086–87, 51 N.W.2d 174, 219 (1952). Alternatively the liquidator argues from Iowa Code § 614.4 which provides:

> In actions for relief on the ground of fraud or mistake, and those for trespass to property, the cause of action shall not be deemed to have accrued until the fraud, mistake, or trespass complained of shall have been discovered by the party aggrieved.

Under that section the correct starting date, according to the liquidator, was the fall of 1980 when he became aware of the

wrongful transfer from FIAC. In no event, he argues, would he be on notice of fraud at any time before liquidation proceedings were commenced March 29, 1979.

We believe Code § 614.4 applies. After his appointment in 1979 the liquidator made several inquiries about the transfer of the stock from FIAC but was met with silence and misrepresentations from Meester. Meester said Regal purchased the Summit stock from Global for "valuable consideration" when in fact it had not. When, in October of 1980, Regal sought the liquidator's release from any claims relating to the Summit stock the liquidator asked to see the loan agreement mentioned in the promissory note between FIAC and Global. The request was refused. Only at this point was the liquidator on any notice that something was amiss. The trial court was right in rejecting appellant's contention that recovery of the $295,000 is barred by the statute of limitations.

VI. It would unnecessarily extend this opinion to discuss in detail a number of other assignments. A claim that the trial court prejudged the credibility of Meester was not preserved in trial court. We give it no further attention. *See Citizens First Nat. Bank v. Hoyt,* 297 N.W.2d 329, 333–34 (Iowa 1980). A claim that the trial court should have granted Regal's motion to dismiss stands on legal or factual contentions we have rejected. The trial court's reception of an opening statement fell within the wide trial court discretion allowed. *See In re Estate of Herm,* 284 N.W.2d 191, 199 (Iowa 1979).

We have also considered and rejected appellant's challenge to the trial court's reception into evidence of depositions. We think the depositions from an action in Rhode Island were proper. The two actions involved substantially the same matter. Hence the trial court properly exercised its discretion in receiving them. *Cf. In re So-*

---

**3.** We have pointed out that it had been cancelled fraudulently when Meester sold Surety to Global in return for 65 percent of Global's stock, December 1976. In return for cancelling the note, FIAC purportedly agreed to accept $150,000 of Global preferred stock. But no stock or money was ever transferred or paid to FIAC.

*derland's Estate,* 239 Iowa 569, 579, 30 N.W.2d 128, 133 (1947) (deposition from another proceeding inadmissible because of substantial difference in the two proceedings). *See* 26A C.J.S. Depositions § 98 at 453–54; 23 Am.Jur.2d, Depositions, § 110 at 438.

 Only one of the appellant's assignments is well taken and the error pointed out in that one has been rendered harmless. The trial court received newspaper articles into evidence. As appellants assert this was error because newspaper articles are not admissible to prove their contents. *Jacobson v. Benson Motors, Inc.,* 216 N.W.2d 396, 399–400 (Iowa 1974). But in our de novo review we have not in any way relied upon or considered the articles. There was no harm to appellants. *See Sawyer v. Sawyer,* 261 Iowa 112, 123, 152 N.W.2d 605, 612 (1967).

AFFIRMED.