**FIRST NATIONAL BANK IN FAIRFIELD, Appellee,**

v.

**FRESCOLN FARMS, LTD., Robert Frescoln, and Charles Randall Frescoln, Appellants.**

No. 87–750.

Supreme Court of Iowa.

Oct. 19, 1988.

Charles A. Coppola of Coppola, Gazzo & Clark, Des Moines, for appellants.

Robert G. Allbee and Wade R. Hauser III of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, and Craig R. Foss of Foss, Kuiken & Gookin, P.C., Fairfield, for appellee.

Considered by McGIVERIN, C.J., and SCHULTZ, LAVORATO, NEUMAN, and SNELL, JJ.

LAVORATO, Justice.

The dispute in this case arose after Merrill R. Frescoln conveyed his unencumbered farmland to a family corporation in return for stock and then gave the stock to two of his three sons. At about the same time these transfers were taking place, Merrill failed to repay an unsecured debt to the First National Bank in Fairfield. The bank obtained a judgment against him, which he was also unable to pay. The issue we must decide is whether the corporate stock can be used to satisfy the judgment against Merrill. The district court said it could, and we agree.

### I. *Background Facts and Proceedings.*

Merrill Frescoln began taking out loans from First National about thirty years before this case began. The money was used to finance his agricultural operations. Merrill's line of credit was based on financial statements he submitted to the bank, and the subsequent loans were always unsecured. Before 1985, he had never experienced any major difficulties in repaying the loans.

First National extended a $400,000 line of unsecured credit to Merrill in 1985. As it had in previous years, the bank based this line of credit on Merrill's financial statement, which he had prepared using the Iowa State University annual land survey data. Merrill's February 1985 statement showed that he owned 1932.5 acres of farmland, 907 of which were unencumbered. The bank did not question the statement's accuracy. Merrill drew on his credit line as he needed the money but did not reach his limit.

In the same year Merrill decided, according to his testimony, to form a corporation so that his estate would remain in the family after his death. The idea for this plan came, in part, from a tax newsletter that Merrill received through a subscription provided to him by First National. At no time, however, did any First National employee give advice on this matter to Merrill. Instead, Merrill and one of his sons, Charles Randall Frescoln, sought assistance from an attorney.

Upon this attorney's advice, a corporation, Frescoln Farms, Ltd., was set up in June 1985. Merrill was the only officer and director of the corporation until January 1, 1987. He testified that he was to receive a yearly salary of $7800 when the corporation made a profit. This amount, Merrill said, was chosen so that his Social Security payments would not be reduced. Merrill never received the salary, however, because Frescoln Farms never made a profit.

Merrill decided to convey only his unencumbered land to the corporation.[1] The value of the land, as determined by Robert J. Mallinger's appraisal, was listed in the corporate books as $484,356.40. The actual transfer of the land occurred on July 1,

---

1. The encumbered land was not involved because of "due on sale" clauses in the mortgages on the land. Such clauses would have allowed the mortgagee, in the event of a change in the land's ownership without the mortgagee's permission, to take such steps as increasing the interest rate or accelerating the principal.

1985, when Merrill received 1500 shares of corporate stock in exchange for the real estate.

Later that summer Merrill contacted his lawyer about also transferring his home to Frescoln Farms. A letter from Merrill to his attorney expressed the fear that the home would be attached by the Federal Land Bank if it remained in Merrill's name. The record does not show whether such a transfer was made.

On July 2 Merrill gave 600 shares of this stock to his son Randall and another 600 shares to his son Robert. The transfer was made without Merrill receiving any actual consideration. When this gift was made, Merrill owed First National $320,-128. He subsequently filed a gift tax return for 1985, listing the total value of the 1200–share gift to his sons as $327,000.

By December 1985 Merrill was unable to make his regular payments on his loan from First National. He told his son Randall about this problem, and Randall prepared an updated financial statement for his father to show the bank. The statement, although dated December 14, was allegedly not given to Merrill by his son until the next month. Its estimate of Merrill's net worth showed that his debts exceeded his assets by $24,632.

On January 1, 1986, Merrill gave his remaining 300 shares of Frescoln Farms to Randall and Robert, again without receiving any actual consideration. On the date of this last transfer, Merrill owed First National $272,037.17.

Although the formation of the corporation was supposedly part of Merrill's estate planning, he did not change his will after the two transfers of stock to his sons. When this case was tried, the will still left Merrill's farm property to his three sons in equal shares.

Later in January, Merrill and Randall met with bank officials to discuss Merrill's new financial statement. They told officials that Merrill had formed a corporation and that he could not pay his debt on schedule. A bank official testified that the Frescolns did not, however, disclose that Merrill had transferred his stock in the corporation to his sons.

Bank officials offered to renew Merrill's line of credit but said that he would have to secure his debt with a first mortgage. The officials suggested using the unencumbered corporate land as security or transferring the debt itself to the corporation. The Frescolns rejected these ideas and only offered the bank a second mortgage on the encumbered land that Merrill had retained.

Negotiations continued until March 1986. These discussions broke down when Merrill informed the bank that his sons, the owners of all the corporate stock, would not agree to use the unencumbered corporate property as security for his debt.

By May 1986 Merrill had become delinquent in his loan payments, and First National commenced a law action against him, seeking recovery on ten notes. The district court entered judgment in favor of the bank for $275,081.86, plus interest, attorney fees, and costs. This judgment is currently unsatisfied in an amount over $300,-000.

First National was unable, of course, to attach the corporate property following the judgment because Merrill no longer owned it. By this time, Randall had become president of Frescoln Farms, and he and Robert were its directors. Neither son, however, has ever worked full time for the corporation. Merrill retained the corporate positions of secretary and treasurer.

First National then commenced the present equity action. Merrill was dismissed as a party after he filed a petition in bankruptcy. Following the dismissal, the bank amended its petition, requesting a declaration that the bank's interest in the corporate property was superior to those of Merrill's sons and an order that the property be sold to satisfy the bank's prior judgment.

As part of this suit, the Frescolns commissioned Roger Poppen to appraise both the corporate property and the property that Merrill held personally. Poppen set the value of the corporate property at $575,035 as of July 1, 1985, the date of the land's transfer from Merrill to the corpora-

tion, and $478,700 as of January 1, 1986, the date of the final stock transfer to Merrill's sons. Merrill's own farmland was worth $700,977 on July 1, 1985, and $592,886 on January 1, 1986. Poppen's calculations showed that Merrill had a negative net worth of $104,400 after the stock transfer on July 2, 1985, and a negative net worth of $283,449 after the second transfer on January 1, 1986.

Randall also produced a new statement of Merrill's net worth for this suit. According to Randall's statement, which included his father's exempt property, Merrill had a net worth of $439,205 on July 1, 1985, and $134,648 on January 1, 1986.

The district court again entered judgment for First National. The court found that Merrill was insolvent and remained so after the first transfer of stock to his sons. While finding no dishonest or deceptive intent on the part of Merrill and his sons, the court said that the transfer of stock "without consideration was constructively and presumptively fraudulent." Because the Frescolns had failed to rebut this presumption by proving that Merrill was solvent after the two transfers, the court concluded that First National had "the right to have [its] judgment receive priority over the rights of Merrill's sons."

The Frescolns have now appealed, raising the following arguments.

First, the Frescolns maintain that First National failed to show it was entitled to corporate property in satisfaction of its judgment against Merrill. The bank disagrees that it had such a burden and contends that the presumption of fraud put the burden of proof, regarding Merrill's solvency, on the Frescolns.

Second, the Frescolns argue that the district court erroneously ignored credible and substantial evidence of Merrill's solvency at the time of the transfers; they allege that this evidence, contained in Merrill's latest financial statement, rebutted the presumption of fraud. First National says that the Frescolns failed to meet this burden of proof and that other evidence supports the district court's finding of insolvency.

Finally, the Frescolns claim that the district court applied the wrong test of insolvency by not including Merrill's exempt property among his assets. First National contends the court applied the correct test, though it was not drawn from Iowa case law.

We review these arguments and the facts of this equity case de novo. Iowa R.App. P. 4. We decline to consider the Frescolns' other arguments because they were not raised before the district court. *See Wade Farms, Inc. v. City of Weldon,* 419 N.W.2d 718, 720 n. 3 (Iowa 1988).

## II. *Burden of Proof.*

The first issue we must decide is whether the Frescolns or the bank had the burden of proof when a presumption of fraud arose. This issue can be resolved by the application of certain well established legal rules.

The record shows that Merrill's transfers of stock to his sons were made "in consideration of love and affection;" according to his testimony, he received nothing else in return for the property. Such a conveyance is merely voluntary and without actual consideration. *See Grimes Sav. Bank v. McHarg,* 224 Iowa 644, 647, 276 N.W. 781, 784 (1938); *see also* 37 C.J.S. *Fraudulent Conveyances* § 141, at 967 (1943); *cf.* Uniform Fraudulent Transfer Act § 3(a) (1984) ("value" is given for transfer if, in exchange, property is transferred or antecedent debt is secured or satisfied); Uniform Fraudulent Conveyance Act § 3 (1918) (similar definition for "fair consideration").

When a transfer of property is without consideration, our longstanding rule has been to presume the transfer fraudulent. *Regal Ins. Co. v. Summit Guar. Corp.,* 324 N.W.2d 697, 703 (Iowa 1982). Such a transfer may be set aside by the transferor's creditors unless the transferee is able to show that the transferor remained solvent after the transaction. *Id.*

Neither actual dishonesty nor intent to deceive must be shown to prove constructive fraud. *Id.* A transaction between a

parent and child will be closely scrutinized. *Commercial Sav. Bank v. Balderston*, 219 Iowa 1250, 1257, 260 N.W. 728, 731–32 (1935); *see also* 37 C.J.S. *Fraudulent Conveyances* § 257, at 1090; *cf.* Uniform Fraudulent Transfer Act §§ 1(7), 4(b)(1) (actual intent to defraud may be shown by transfer to "insider," including relative of debtor).

These firmly established rules of law are intended to effect an equitable maxim: "a person must be just before [he or she] is generous." *Balderston*, 219 Iowa at 1254, 260 N.W. at 730. The Frescolns attempt to sidestep the obvious import of these rules by arguing that the bank had to prove its "right to execute on each and every share of stock transferred by Merrill." We think it is clear under the law, however, that the Frescolns had the initial burden of showing that Merrill was just before he was generous.

After closely scrutinizing the transactions here, we hold that the transfers of stock from Merrill to his sons were constructively fraudulent because they were without actual consideration. *See Regal Ins. Co.*, 324 N.W.2d at 703. His sons, then, as transferees, had the burden of showing that he was solvent after each transfer. *See id.*

### III. *Solvency After Each Transfer.*

We now come to the dispositive issue of this case: whether the Frescolns proved that Merrill was solvent after he made the stock transfers to his sons.

■ The Frescolns argue that the evidence shows Merrill to have been solvent after each of the two transfers was made. The success of this argument, however, apparently depends on Merrill's statutorily exempt property being included in the calculation of his net worth. Reaching back over a century, the Frescolns contend that we should apply the test for solvency from *McKown v. Furgason*, 47 Iowa 636 (1878). That case said solvency is the ability to pay one's debts, regardless of whether one's property is subject to execution. *Id.* at 637.

The Frescolns maintain that the district court should not have used tests for insolvency from the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act, which require the value of exempt property to be excluded from the debtor's net worth. Without the value of Merrill's exempt property in the balance, the district court determined that he was insolvent at the time of each transfer.

We think the test for insolvency used by the district court, which is embodied in the common law as well as the uniform acts, is the better one, and we adopt it. Under this test, most recently set out in the Uniform Fraudulent Transfer Act, an individual debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation." Uniform Fraudulent Transfer Act § 2(a); *see also* Uniform Fraudulent Conveyance Act § 2(1) (similar definition); 37 Am.Jur.2d *Fraudulent Conveyances* § 15, at 704–05 (1968); 37 C.J.S. *Fraudulent Conveyances* § 106, at 945–46.

On its face, this test would seem to be very similar to the one used in *McKown*. There, however, the type of property included in the calculation of solvency was very different. As we noted above, the *McKown* court included exempt property in the calculation. We think this approach is a poor one. Solvency that is based on exempt property is no better than insolvency to a creditor because the property is not available without affirmative action by the debtor. 37 C.J.S. *Fraudulent Conveyances* § 105, at 945. If a creditor cannot reach the property through some sort of legal process, we hold that the property cannot be used to show solvency. *See id.*

The Uniform Fraudulent Transfer Act provides a better definition of the assets that should be included in a calculation of solvency:

"Asset" means property of a debtor, but the term *does not include:*

(i) property to the extent it is encumbered by a valid lien;

(ii) property to the extent it is generally *exempt* under nonbankruptcy law; or

(iii) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

Uniform Fraudulent Transfer Act § 1(2) (emphasis added); *see also* Uniform Fraudulent Conveyance Act § 1 ("assets" defined as property of debtor that is not exempt from liability for debts).

We adopt this definition because it assures that a "solvency" supported by such "assets" will have some meaning to a creditor, as the property can be reached through the legal process. Under this approach, creditors will not have to rely on a solvency that they "cannot employ in the payment of the debts of an unwilling debtor." 37 C.J. S. *Fraudulent Conveyances* § 105, at 945. To the extent *McKown v. Furgason*, 47 Iowa 636 (1878), holds that "solvency" should be defined differently, we overrule it.

■ Having adopted the uniform act definitions of "insolvency" and "asset," we now turn to the issue of whether Merrill was solvent after he transferred the stock to his sons.

Solvency must be determined as of the time the alleged fraudulent transfer took place. *Balderston*, 219 Iowa at 1256, 260 N.W. at 731. The dates in question here are July 2, 1985 and January 1, 1986.

For both dates the Frescolns offer what they call "credible evidence" of Merrill's solvency. These calculations are questionable for two reasons. Not only do they include exempt property, which we have held is not an "asset" in this context, but they also include values of doubtful accuracy for Merrill's nonexempt property. The record shows that Merrill's financial statements contain very inconsistent land values, which sometimes vary more than 100% from one statement to another for a single parcel of land. We do not find such evidence very persuasive.

More credible, we think, are the Poppen appraisals, which the district court also accepted. These appraisals include no exempt property and are very detailed. They show that Merrill's debts exceeded his assets by $104,400 after the July 2, 1985

transfer, and by $283,449 after the January 1, 1986 transfer.

Because Merrill's debts exceeded his assets after each transfer, we hold that the Frescolns failed to satisfy their burden of proving his solvency, which arose along with the presumption of fraud. *See Regal Ins. Co.*, 324 N.W.2d at 703. The stock transfers from Merrill to his sons are therefore fraudulent, giving the bank, as Merrill's creditor, the right to have its judgment receive priority over the rights of Merrill's sons in regard to the fraudulently conveyed stock. *See id.*

Our conclusion that the transfers were fraudulent is buttressed by more direct evidence as well. The letter from Merrill to his attorney about transferring his home to the corporation to avoid attachment by another creditor indicates that Merrill may have had the actual intent to defraud his creditors. *See* Uniform Fraudulent Transfer Act 4(a)(1). Merrill's failure to change his will after the "estate planning" he did by forming the corporation also raises the possibility of actual intent to defraud. While actual intent to deceive does not have to be shown to prove constructive fraud, *Regal Ins. Co.*, 324 N.W.2d at 703, this evidence lends additional support to our holding based on Merrill's insolvency.

IV. *Disposition.*

In summary, the stock transfers from Merrill to his sons were constructively fraudulent because they were without actual consideration. The Frescolns then had the burden of proving that Merrill was solvent after each transfer. At trial they offered calculations of his net worth that included the value of his exempt property.

Overruling *McKown v. Furgason*, 47 Iowa 636 (1878), we hold here that a calculation of solvency cannot include the value of exempt property. Instead, we have adopted the definitions of "insolvency" and "asset" from the Uniform Fraudulent Transfer Act. We have rejected the Frescolns' evidence because exempt property was included in their calculations and because their values for nonexempt property

**438**

were questionable. Instead, like the district court, we have found that the most credible evidence shows that Merrill was insolvent after each transfer. Accordingly, we affirm the district court's conclusion that the First National Bank in Fairfield, as Merrill's creditor, had the right to have its judgment receive priority over the rights of Merrill's sons in regard to the fraudulently conveyed stock.

AFFIRMED.