**In re Richard Dverg KRANTZ aka R. Dverg Krantz, Karen Elizabeth Krantz, Debtors.**

**Bankruptcy No. L88–00686C.**

United States Bankruptcy Court, N.D. Iowa.

Feb. 21, 1989.

Dan Childers, Cedar Rapids, Iowa, for debtor.

George D. Keith, Waterloo, Iowa, for Federal Land Bank of Omaha.

## MEMORANDUM AND ORDER Re: Objection to Exemptions

MICHAEL J. MELLOY, Chief Judge.

The matter before the Court is the Federal Land Bank of Omaha's Objection to Exemptions claimed by the Debtors. The Federal Land Bank claims that the Debtors converted non-exempt property into exempt property with the intent to hinder, delay or defraud their creditors.

This Memorandum and Order constitutes the Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

### FINDINGS OF FACT

The Debtors involved in this case are Richard Dverg and Karen Elizabeth Krantz (Debtors). The Debtors commenced farming in 1969. In 1974, the Debtors purchased 470 acres of real estate in Fayette County, Iowa, under a real estate installment contract. On February 7, 1979, the Debtors borrowed $1,400,000 from the Federal Land Bank of Omaha (Federal Land Bank). The money borrowed from the Federal Land Bank was used to purchase 600 additional acres of real estate in Buchanan County, Iowa, to pay off the remaining real estate contract balance on the 470 acres in Fayette County, and to construct a new home on the Buchanan County real estate.

The newly constructed home was first used as the Debtors' homestead in the Fall of 1980 (approximately 1½ years after the loan with Federal Land Bank was closed). The Debtors secured the loan to Federal Land Bank by a mortgage which encumbered all of the real estate the Debtors owned in both Buchanan County and Fayette County, Iowa.

In 1984 the Debtors purchased an additional 80 acres in Buchanan County adjacent to the 600 acre property. The purchase of the 80 acre tract of land was financed with a second loan from Federal Land Bank. The Federal Land Bank released 80 acres from the original loan, but simultaneously encumbered those 80 acres as additional security for the second loan. Therefore, the total acreage securing the second loan was 160 acres (the 80 acres purchased plus 80 acres from the first loan).

Mr. Krantz testified that beginning in 1983 he became concerned about the continued viability of his farming operation. At about that time, Mr. Krantz began negotiations with the Federal Land Bank seeking a reduction in the interest rate and a lowering of the principal amount due on his loan. The Federal Land Bank declined to go along with these proposals. Presumably, this decision was based upon the Debtors' financial condition at the time. While the value of the real estate which secured the Federal Land Bank loan was declining, Debtors' financial statement showed that the Debtors had substantial other assets which indicated a positive net worth. A balance sheet dated December 1, 1985, showed total assets of $2,551,722, of which $1,439,000 was real estate, against total liabilities of $1,889,641. This left the Debtors with a positive net worth of $662,081. The financial statement also showed that the Debtors had only minimal debt in addition to the amount still owing on the two Federal Land Bank loans.

In mid–1985, Mr. Krantz began seeking a release from Federal Land Bank on the mortgage as to the 40 acres encompassing his residence. It was clearly his intention to create a homestead which was free and clear of the Federal Land Bank lien. Eventually, an agreement was negotiated with Federal Land Bank to obtain a release as to those 40 acres. That agreement included a provision whereby the Debtors agreed to pay $127,000 to Federal Land Bank to pay off the second loan which was secured by the 160 acres. Those 160 acres were thus free and clear of any Federal Land Bank lien. The Debtors then agreed to substitute as collateral for the 40 acre homestead the 160 acre tract which had previously secured the second Federal Land Bank loan. This proposal was acceptable to Federal Land Bank since both parties agreed that the two tracts were of approximately the same value.

It is clear that given the totality of the circumstances, and in particular, the fact that the Debtors have been negotiating with Federal Land Bank for some time,

that the Federal Land Bank was aware that it was the intent of the Debtors to create a homestead which was free and clear of the Federal Land Bank mortgage. By agreeing to accept the substitution of collateral, the Federal Land Bank agreed to release the homestead from their mortgage lien.

Sometime in late 1985 or early 1986, Mr. Krantz consulted with several attorneys to determine how to shelter his assets from the Federal Land Bank. The attorneys advised him that under Iowa exemption law the cash value of life insurance is exempt from creditors.

From April 21, 1986 through January, 1987, the Debtors purchased several life insurance policies which together provided death benefits of over 3 million dollars. Those policies also have a substantial cash surrender value. The Debtors paid a total of $536,754.73 for policies which have a cash value of $539,548, as of May 13, 1988. The following table indicates the dates and values of the life insurance policies purchased by the Debtors.

| Policy Name | Policy # | Policy Date & Amount Paid | Insured | Face Value | Cash Surrender Value |
|---|---|---|---|---|---|
| The Midland | L01176 | 04/21/86 $ 20,011.00 | Karen | $ 20,011 | $ 21,495 |
| The Midland | U28670 | 04/21/86 $ 59,989.00 | Karen | $300,000 | $ 64,012 |
| The Midland | U28667 | 04/21/86 $103,720.00 | Dverg | $500,000 | $112,316 |
| First Delaware | 7200000822 | 08/07/86 $ 99,999.83 | Dverg | $665,552 | $100,319 |
| First Delaware | 7200000868 | 08/12/86 $101,534.90 | Karen | $892,650 | $100,679 |
| Northwestern | 10 184 343 | 12/18/86 $ 55,735.00 | Dverg | $254,352 | $ 51,537 |
| Northwestern | 10 150 713 | 12/18/86 $ 55,765.00 | Dverg | $254,352 | $ 51,504 |
| Northwestern | 10 150 669 | 12/18/86 $ 20,000.00 | Darin | $207,439 | $ 18,809 |
| Northwestern | 10 150 628 | 12/18/86 $ 20,000.00 | Jeremy | $227,968 | $ 18,877 |
| | Totals | $536,754.73 | | $3,322,324 | $539,548 |

The total amount each family member is insured for by policies purchased on or after April 21, 1986, is as follows:

| | | |
|---|---|---|
| Dverg | – | $1,694,190.00 |
| Karen | – | $1,212,661.00 |
| Darin | – | $ 207,434.00 |
| Jeremy | – | $ 227,968.00 |

The premiums on the Northwestern Mutual Life Insurance Company policies were actually paid in early January, 1987, although the policies were back dated at the Debtors' request to December 18, 1986. The Debtors had given an updated financial statement to the Federal Land Bank in December, 1986, which showed that the Debtors had converted substantially all of their non-exempt property into life insurance. This statement was not entirely accurate given the fact that the policies purchased from Northwestern Mutual Life Insurance Company were not paid for until early January, 1987. The two policies insuring the lives of the Krantz children (Darin and Jeremy) contained applications dated December 18, 1986, while the two policies insuring the life of Dverg Krantz contained applications dated January 7, 1987. The premiums for all four policies were paid on or around January 7, 1987.

As a result of these purchases, the Debtors were rendered insolvent (assuming the life insurance policies are exempt). The Debtors provided an updated balance sheet to the Federal Land Bank on December 23, 1986, and again on January 29, 1987. The January 29, 1987, balance sheet shows total assets of $2,006,321 and total liabilities of $1,847,804. Total assets include cash value life insurance of $520,600, as well as Debtors' homestead, valued at $102,000, and machinery which would presumably be exempt to the extent of $20,000. The total Federal Land Bank debt, including the payment due in January, 1987, was $1,502,356.

Under questioning, Mr. Krantz was vague about where the money had come from to purchase the life insurance. It appears that Mr. Krantz had business activities outside farming, including partnerships, in which he had invested. He had also done quite well investing in various stocks and bonds. Debtors' 1985 and 1986 tax returns show that approximately $300,000 was realized from the liquidation of stocks and bonds as well as interest and dividends earned in those years. On December 26, 1986, the Debtors borrowed an additional $97,050 from Noel Krantz, Dverg Krantz' brother. As security for this loan, the Debtors granted Noel Krantz a security interest in nearly $100,000 worth of previously unencumbered machinery and equipment. The money borrowed from Noel Krantz was used to purchase the life insurance policies from Northwestern Mutual Life Insurance Company which were paid for in January, 1987 and back dated to December 16, 1986. The balance of the money used to purchase the life insurance appears to have come from Debtors' farming operations, including a 1986 rent payment of $69,514.

By mid-December 1986, the Debtors had decided not to pay the Federal Land Bank the approximately $181,700 due on January 1, 1987. On January 1, 1987, the Debtors defaulted on their loan with Federal Land Bank. Since the payment to Federal Land Bank was an annual payment and the Debtors had made their January 1, 1986, payment, the Debtors were not in default until January 1, 1987. The balance outstanding was approximately $1,502,356, including the $181,700 payment. On July 29, 1987, the Federal Land Bank commenced foreclosure proceedings in Buchanan County District Court. A receiver was appointed on September 16, 1987.

In the Spring of 1987, the Debtors cash rented the farm real estate. Debtors' 1987 income tax return show a total cash rent received of $97,985. Mr. Krantz testified the 1987 rent was used to pay real estate taxes, professional fees and living expenses.

Mr. Krantz testified that he believed that he could not claim exemptions until he filed bankruptcy; that is, property claimed as exempt was not exempt until the property owner filed bankruptcy. His attorney advised him that the Iowa legislature was considering changes to the insurance exemption law. Mr. Krantz followed the ac-

tivities of the Iowa legislature towards the end of 1987 and early 1988. On April 28, 1988, the Debtors filed for bankruptcy, seeking to lock into the insurance exemption laws that were in existence on that date. On May 15, 1988, Iowa's Governor signed into law legislation modifying the Iowa insurance exemption laws. *See* 1988 Iowa Acts, ch. 1255 §§ 7–9, H.F. 649 §§ 7–9.

On Schedule B–4 of Debtors' bankruptcy schedules, the Debtors claim as exempt the cash value of life insurance in the amount of $561,871. The Debtors also claim as exempt their homestead in the amount of $107,200. Federal Land Bank has objected to Debtors claim of exemption as to the homestead as well as to all of the life insurance policies purchased in 1986 and 1987. The Debtors also claim as exempt interests in other life insurance policies, with a cash value of $22,323, which had been owned for several years prior to the filing of Debtors' bankruptcy petition. Exemption claims regarding those policies are not objected to by the Federal Land Bank and the claim of exemption as to those policies is allowed.

In converting the substantial amounts of non-exempt property into exempt property, the Debtors were motivated by more than the normal intent to shield their assets from the claims of creditors (in this case the Federal Land Bank). The Debtors were very frustrated with the refusal by the Federal Land Bank to substantially reduce either the principal or interest owed to the Federal Land Bank. The Debtors candidly admitted that the conversion of non-exempt property into life insurance was done with the intent of enhancing the Debtors' bargaining position with the Federal Land Bank. Debtors admitted that they believed the purchase of substantial life insurance would put pressure on the Federal Land Bank to negotiate a better deal with the Debtors.

Debtors' schedules show that the Debtors currently have virtually no unencumbered property which is not claimed as exempt. The debts principally consist of the Federal Land Bank debt which is listed at $1,735,669, the debt to Noel J. Krantz and a loan with the Commodity Credit Corporation for sealed grain.

## DISCUSSION

### I. OBJECTION TO LIFE INSURANCE EXEMPTION

#### A. *Burden of Proof*

■ The Federal Land Bank, as the objecting creditor, bears "the burden of proving that the [Krantz'] exemptions are not properly claimed." Bankr.Rule 4003(c). This Court has held that in the context of a complaint to set aside a transfer as a fraudulent conveyance pursuant to § 548 of the Bankruptcy Code, the level of proof required is that of a "preponderance of evidence that the debtor acted with actual intent to hinder, delay or defraud its creditors." *In re Breuer*, 68 B.R. 48, 51 (Bankr. N.D.Iowa 1985).

The Iowa Supreme Court appears to hold that in matters concerning fraud, a higher burden of proof is required, that the complainant must prove fraud by clear, convincing and satisfactory evidence. *See Rouse v. Rouse*, 174 N.W.2d 660, 666 (Iowa 1970) ("clear and satisfactory"); *Travelers Indemnity Co. v. Cormaney*, 138 N.W.2d 50, 55, 258 Iowa 237, 244–45 (1965) ("clear, satisfactory and convincing"). *See also In re Adlman*, 541 F.2d 999, 1005 (2d Cir. 1976) ("convincing evidence of extrinsic fraud"). In *Breuer*, the court noted that the "burden, although not impossible, is very difficult for a[n objector] to meet." *Breuer*, 68 B.R. at 51. The court there also noted that "[a]ny lesser burden would substantially erode the 'fresh start' policy behind ·exemption statutes." *Id.* The Court does not find that the *Breuer* and *Rouse* burdens of proof are substantially different. The Court now holds the burden of proof is clear and convincing evidence.

#### B. *General Background*

The issue of whether to allow the conversion of non-exempt property to exempt property prior to the filing of bankruptcy is one which has long troubled the courts faced with the issue. *See e.g., Forsberg v. Security State Bank*, 15 F.2d 499 (8th Cir.

1926) (Allowing conversion of non-exempt property to exempt property); *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988) (Denying discharge to debtor who converted non-exempt property into exempt property); *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866 (8th Cir.1988) (Allowing claimed exemption of property which was converted from non-exempt property shortly before bankruptcy was filed).

One of the primary purposes behind exemption statutes is to provide the debtor with the necessities of life. Exemption statutes reflect this concern by the type of property they exempt. For example, the Iowa exemption statute allows a debtor to claim as exempt, among other things, wearing apparel, household goods, interests in any unmatured life insurance policy, health aids, rights in social security benefits, one motor vehicle, tools of the trade, and livestock. *See* Iowa Code § 627.6(1–12) (1987). Additionally, a debtor may claim their homestead as exempt. *See* Iowa Code § 561.16 (1987).

Some of the items allowed to be claimed as exempt are exemptible only to the extent they do not exceed certain statutorily set values. For example, wearing apparel may be claimed as exempt, but only to the extent of one thousand dollars. Iowa Code § 627.6(1) (1987). Likewise, a motor vehicle may be claimed as exempt, but only to the extent of $5,000. *See* Iowa Code § 627.6(9)(b) (1987). On the other hand, other exempt property has no statutorily set dollar limit. For example, the debtor's interest in any unmatured life insurance policy is not limited in value. Iowa Code § 627.6(6) (1987). The debtor's interest in their homestead is similarly unlimited by value limitations. Iowa Code § 561.16 (1987).

Exemptions are to be liberally construed in favor of the debtor, and strictly construed against the objector. *Westinghouse Credit Corporation v. Crotts*, 98 N.W.2d 843, 845, 250 Iowa 1273, 1276 (1959); *In re Hahn*, 5 B.R. 242, 245 (Bankr.S.D.Iowa 1980). Such a policy of construction furthers the legislative intent of ensuring that honest debtors are given a chance to make a "fresh start" of their lives. Their debts may be discharged, and the debtor is allowed to save some of his or her property to use in their fresh start. By imposing value limitations on the exemptions, the legislature has explicitly stated its intent— that property of a certain type and up to a certain value may be claimed as exempt by a debtor.

Courts generally have little problem with allowing debtors their claimed exemptions to the extent of the value limits set forth in the applicable statute. The more serious problem arises when the legislature has set no value limitations on a certain type of property. For example, by statute, a debtor may claim as exempt their homestead whether it is a mobile home worth $1,500 or a mansion worth $1,500,000. Iowa Code § 561.16 (1987) (subject to certain exceptions set forth in Iowa Code § 561.21 (1987)). Likewise, the Iowa statute in effect on the date this case was filed placed no limit on a debtor's exemption for unmatured life insurance policies. Iowa Code § 627.6(6) (1987) (amended by 1988 Acts, ch. 1255 § 7, H.F. 649 § 7). The courts must determine when a debtor is acting "honestly" in taking only what the law allows; or when a debtor is acting "dishonestly," i.e. with the intent to hinder, delay or defraud his or her creditors.

The *Hanson* and *Tveten* cases illustrate the posture these cases usually arise in. Assuming the debtor has filed bankruptcy, the objecting creditor will object to the claimed exemption (*Hanson*), which if successful would pull that property back into the bankruptcy estate; or alternatively, the objecting creditor will move to have the debtor's discharge denied (*Tveten*), the ultimate penalty in bankruptcy.[1]

---

1. *See In re Tveten*, 70 B.R. 529, 532 (Bankr.D. Minn 1987), listing five different contexts in which the issue may arise. Although these five contexts involve the application of different laws, they each involve essentially either an objection to a claimed exemption or to the discharge.

■ The *Hanson* and *Tveten* cases also illustrate the different applicable law in exemption and discharge cases. The *Tveten* court phrased the differences thusly: "When the debtor claims a state-created exemption, the scope of the claim is determined by state law.... A debtor's right to a discharge, however, unlike his right to an exemption, is determined by *federal*, not state, law." *Tveten*, 848 F.2d at 873–74 (emphasis in original, citations omitted). Iowa has opted out of the federal bankruptcy exemption scheme, pursuant to 11 U.S. C. § 522(b)(1) and Iowa Code § 627.10 (1987). Thus, in Iowa, debtors claim "state-created exemptions." In this case, the Court looks to Iowa law to decide whether the exemptions should be allowed.

The issue facing the Court today has rarely, if ever, been directly addressed by the Iowa Supreme Court. One pronouncement by that court reads: "[T]he conversion of nonexempt property into exempt property does not *of itself* invest the creditor with any right to follow the exempt property." *American Savings Bank of Marengo v. Willenbrock*, 228 N.W. 295, 299–300, 209 Iowa 250, 259 (1929) (emphasis added). This rule, if it may be regarded as such, is the general rule that has been used by many courts when faced with the issue this Court faces today. The critical

language in this rule is the emphasized part: conversion does not *of itself* give rise to grounds for denying the claimed exemption. In deciding whether to grant claimed exemptions, this court must determine two issues. First, does the Iowa insurance exemption law permit the exemption; and second, is there "extrinsic" evidence of fraud to support a denial of the exemptions.

■ Consternation in the courts over the conversion of non-exempt property into exempt property issue arises when the state legislatures have granted an unlimited monetary exemption to debtors, as has been the case of the Iowa insurance exemption law.[2] By creating an exemption with no monetary cap, the Iowa Legislature seemed to approve of debtors claiming as exempt insurance policies of unlimited value, even if the insurance policies were purchased on the eve of bankruptcy, or with the intent to hinder, delay or defraud the debtor's creditors. In the Spring of 1988, the Iowa Legislature indicated that it does not approve of claims of exemptions in insurance policies under circumstances such as those described above.

On May 15, 1988, the Governor of Iowa signed into law a bill to modify the Iowa Insurance Exemption law.[3] The bill cre-

---

**2.** Pertinent provisions of the Iowa exemption law, in effect prior to May 15, 1988, reads as follows:

> A policy of insurance on the life of an individual, in the absence of an agreement or assignment to the contrary, shall inure to the separate use of the spouse and children of said individual, independently of the individual's creditors.
>
> The proceeds of an endowment policy payable to the assured on attaining a certain age shall be exempt from liability for any of the assured's debts.
>
> \*　\*　\*　\*　\*　\*
>
> Iowa Code § 511.37 (1987) (repealed by 1988 Iowa Acts, ch. 1255 § 8, H.F. 649 § 8.)
>
> A debtor who is a resident of this state may hold exempt from execution the following property:
> (6) Any unmatured life insurance policy owned by the debtor, other than a credit life insurance contract.
>
> Iowa Code § 627.6(6) (1987) (amended by 1988 Acts, ch. 1255 § 7, H.F. 649 § 7). (Credit life insurance is "insurance to cover a specific loan

or obligation." *In re O'Brien*, 67 B.R. 317, 318 (Bankr.N.D.Iowa 1986)).

**3.** Pertinent provisions of the May 15, 1988, amendments read as follows:

> The interest of an individual in any accrued dividend or interest, loan or cash surrender value of, or any other interest in a life insurance policy owned by the individual if the beneficiary of the policy is the individual's spouse, child, or dependent. However, the amount of the exemption shall *not exceed ten thousand dollars in the aggregate of any interest or value in insurance acquired within two years of the date execution is issued or exemptions are claimed,* or for additions within the same time period to a prior existing policy which additions are in excess of the amount necessary to fund the amount of face value coverage of the policies for the two-year period. For purposes of this paragraph, acquisitions shall not include such interest in new policies used to replace prior policies to the extent of any accrued dividend or interest, loan or cash surrender value of, or any other

ated a $10,000 cap on certain life insurance policies. Those insurance policies subject to the $10,000 limit include those acquired within two years of the date the exemption is claimed. The Debtors filed for bankruptcy before the bill was signed, and therefore the modifications do not affect the Debtors. The exemption law in effect on the date of filing governs a debtor's right to claim exemptions. *In re O'Brien*, 67 B.R. 317, 319 (Bankr.N.D.Iowa 1986); *In re Punke*, 68 B.R. 936, 939 (Bankr.N.D.Iowa 1987).

## C. *Badges of Fraud*

The Iowa Supreme Court has stated that "[f]raud is not committed openly. It is an offense of secrecy. Direct evidence is rarely obtainable. Frequently, it can be shown only by the circumstances admitted by the parties to it. Fraud may, and usually must be, proved by circumstantial evidence. The individual circumstances are usually inconclusive and attacked separately may be blown away. The circumstances must ordinarily be considered together, and the force and weight to be given them are that of them in combination." *Rouse v. Rouse*, 174 N.W.2d 660, 667 (Iowa 1970) *citing Hatheway v. Hanson*, 297 N.W. 824, 827, 230 Iowa 386, 393 (1941) and *First Nat'l Bank v. Hartsock*, 210 N.W. 919, 920, 202 Iowa 603, 604 (1926). What the Iowa Supreme Court has said, essentially, is that "extrinsic" evidence of fraud must be produced, beyond the transaction itself. Many courts have used the term "extrinsic" in describing the sorts of evidence that will lead the court to deny an exemption or discharge, but few, if any, courts have defined what exactly is meant by this "extrinsic" evidence.

When the *Willenbrock* court said that "the conversion of nonexempt property into exempt property does not *of itself....*" give rise to grounds for denying the claimed exemption, the court meant that the transaction itself, without regard to anything else, is not sufficient to deny the exemption. Thus, the act of converting non-exempt property to exempt property is not enough to deny the exemption. The *Tveten* court stated that having the motivation to place the property beyond the reach of creditors is not sufficient to deny a discharge. *Tveten*, 848 F.2d at 874. The actual[4] intent to hinder, delay or defraud one's creditors *is* sufficient to deny an exemption. Arguably, the purpose in claiming an exemption or the motivation in placing property beyond the reach of creditors and the intent to hinder, delay or defraud one's creditors are the two sides of the same coin. Thus, the finder of fact must determine what the debtor's intent was in making the conversion at the time of the conversion.

Because intent to hinder, delay or defraud is so difficult to prove directly, the Iowa Supreme Court relies on "badges or

---

interest in the prior policies at the time of their cancellation.

In the absence of a written agreement or assignment to the contrary, upon the death of the insured any benefit payable to the spouse, child, or dependent of the individual under a life insurance policy shall inure to the separate use of the beneficiary independently of the insured's creditors.

A benefit or indemnity paid under an accident, health, or disability insurance policy is exempt to the insured or in case of the insured's death to the spouse, child, or dependent of the insured, from the insured's debts. In case of an insured's death the avails of all matured policies of life, accident, health, or disability insurance payable to the surviving spouse, child, or dependent are exempt from liability for all debts of the beneficiary contracted prior to death of the insured, but the amount thus exempted shall not exceed fifteen thousand dollars in the aggregate.

1988 Iowa Acts, ch. 1255 § 7, H.F. 649 § 7 (amending Iowa Code § 627.6(6) (1987)) (emphasis added).

APPLICABILITY. 1. The provisions of this Act relating to exemptions for the proceeds of a life insurance policy payable upon the death of the insured apply to proceeds payable on or after the effective date of this Act.

2. The provisions of this Act relating to exemptions for interests in life insurance policies, other than interests in the proceeds of a policy payable upon the death of the insured, apply to interests acquired on or after January 1, 1988.

1988 Iowa Acts, ch. 1255 § 9, H.F. 649 § 9.

4. The objector must prove *actual* intent to hinder, delay or defraud creditors; constructive intent is not sufficient. *See In re Breuer*, 68 B.R. 48, 51 (Bankr.N.D.Iowa 1985).

indices of fraud" to determine the debtor's intent. The intent involved is a question of fact. *Tom Riley Law Firm, P.C. v. Padzensky*, 430 N.W.2d 416, 418 (Iowa 1988).

No listing of badges of fraud is exhaustive, but courts have set forth several badges or indicia which commonly appear. *See Rouse*, 174 N.W.2d at 667–68 (List includes inadequate consideration, insolvency of transferor, pendency or threat of third party litigation, relationship between transferor and transferee, retention by grantor of the property transferred, and the transfer of substantially all the debtor's property when "embarrassed financially"). Other bankruptcy courts faced with a debtor who converted non-exempt property into potentially exempt life insurance policies have set forth a list of seven badges of fraud. These badges include the following:

(1) Whether there was fair consideration paid for the life insurance policy;

(2) Whether the [debtor] was solvent or insolvent as a result of the transfer or whether he was insolvent at the time of the transfer;

(3) The amount of the policy;

(4) Whether the [debtor] intended, in good faith, to provide by moderate premiums some protection to those to whom he had a duty to support;

(5) The length of time between the purchasing of a life insurance policy and the filing of the bankruptcy;

(6) The amount of non-exempt property which the debtor had after purchasing the life insurance policy;

(7) The [debtor's] failure to produce available evidence and to testify with significant preciseness as to the pertinent details of his activities shortly before filing the bankruptcy petition.

*Matter of Mehrer*, 2 B.R. 309, 312 (Bankr. E.D.Wash.1980). This listing of badges of fraud has been adopted by other courts. *See e.g., In re Mueller*, 867 F.2d 568, 570 (10th Cir.1989), *aff'g* 71 B.R. 165, 168 (D.Kan.1987); *In re Summers*, 85 B.R. 121, 126 (Bankr.D.Or.1988). Badges of

fraud similar to these, but applicable more generally, were used by the bankruptcy court in the *Tveten* case in determining fraudulent intent in a denial of discharge context. *In re Tveten*, 70 B.R. 529, 534 (Bankr.D.Minn.1987). Because the badges of fraud provide a useful framework with which to study the facts, this Court will use the *Mehrer* listing of badges of fraud as well.

### 1. Fair Consideration

■ The parties do not appear to dispute the fact that the Debtors paid fair and adequate consideration for the life insurance policies. In return for cash payments of $536,754.73, the Debtors received life insurance with a face value of $3,322,324 and a cash surrender value of $539,548 (as of May 13, 1988). The Court finds that the Debtors paid fair and adequate consideration for the policies.

### 2. Insolvency at the Time the Life Insurance Policies were Purchased

The Debtors were rendered insolvent as a result of the life insurance purchases. The Iowa Supreme Court has recently adopted the definitions of "insolvent" and "asset" from the Uniform Fraudulent Transfer Act (UFTA). *First Nat'l Bank in Fairfield v. Frescoln Farms, Ltd.*, 430 N.W.2d 432, 436–37 (Iowa 1988). In Iowa, "an individual debtor is insolvent 'if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation.'" *Frescoln*, 430 N.W.2d at 436 *citing* UFTA § 2(a). Exempt property is not included in the UFTA's definition of "assets." " 'Asset' means property of a debtor, but the term *does not include:* (i) property to the extent it is encumbered by a valid lien; (ii) property to the extent it is generally *exempt* under nonbankruptcy law." *Frescoln*, 430 N.W.2d at 436 *citing* UFTA § 1(i) & (ii) (emphasis in *Frescoln*). The *Frescoln* definition of "insolvent" is substantially the same as the definition set forth in the Bankruptcy Code. *See* 11 U.S. C. § 101(31).[5] A review of the December

---

**5.** 11 U.S.C. § 101(31) reads in pertinent part: In this title—

(31) "insolvent" means—

23, 1986, and January 29, 1987, balance sheets Dverg Krantz prepared for the Federal Land Bank indicate that the Debtors were rendered insolvent by the purchase of the insurance policies. Removing encumbered property and "generally exempt" property from the balance sheet indicates that the Debtors had little, if any, "assets," as defined by *Frescoln* and the UFTA, after the insurance purchases. Based on the January 29, 1987 balance sheet, the Debtors' net assets after deducting exempt property was as follows:

| | |
|---|---|
| Total Assets | $2,006,321.00 |
| Less: Cash value life insurance | − $ 520,600.00 |
| Homestead | − $ 102,000.00 |
| Machinery | − $ 20,000.00 |
| Net Assets | $1,363,721.00 |

The total liabilities equaled $1,847,804. Clearly, the purchase of over $500,000 cash value life insurance rendered the Debtors insolvent.

### 3. Amount of the Policy

The Debtors purchased life insurance on a grand scale, as few other debtors who have come before this Court are able to do. The Debtors assert that amount is irrelevant for the Court's determination of whether the exemption should be allowed. The Federal Land Bank claims that the amount the Debtors have put into insurance exceeds any reasonable exemption claim.

This Court is aware of the 1988 amendments to the insurance exemption laws in Iowa. *See supra* footnotes 2 and 3. Although these amendments to the insurance exemption laws do not apply to this case, they do indicate the current legislative intent regarding exemption law policy. Chapter 4 of the Iowa Code, Construction of Statutes, informs the Court's interpretation of the legislative intent for statutes, whenever enacted. Section 4.4(3) states:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

"In enacting a statute, it is presumed that ... [a] just and reasonable result is intended." Iowa Code § 4.4(3) (1987). To allow the Debtors to exempt over a half a million dollars worth of life insurance would not be a "just and reasonable result," rather, it would be a clear abuse of the bankruptcy process.

Other courts faced with overreaching debtors have reached the same conclusion. For example, in *Tveten*, the Eighth Circuit Court of Appeals stated: "the policy of [exemption] statutes is to favor the debtors *... in the limited amounts allowed to them by preventing the forced loss of the home and of the necessities of subsistence ....*" *Tveten*, 848 F.2d at 875 *citing Forsberg v. Security State Bank*, 15 F.2d 499, 501 (8th Cir.1926) (emphasis in *Tveten*). The *Tveten* debtor owed approximately $19,000,000 to his creditors. He attempted to claim as exempt approximately $700,000 in cash value life insurance. In discussing other cases, the *Tveten* court noted that "the exemptions involved in these cases comported with federal policy to give the debtor a 'fresh start'—by limiting the monetary value of the exemptions. This policy has been explicit, or at least implicit, in these cases." *Tveten*, 848 F.2d at 875. The court continued: "In the instant case, however, the state exemption relied on by Tveten was unlimited, with the potential for unlimited abuse." *Tveten*, 848 F.2d at 876. The approximately $550,000 of cash value life insurance in this case is as objectionable as the $700,000 of insurance which the Eighth Circuit Court of Appeals found objectionable in *Tveten*.

Likewise, in *In re Zouhar*, 10 B.R. 154, 156 (Bankr.D.N.M.1981) (cited by *Tveten*, 848 F.2d at 876) the court found that the possibility of the debtor emerging from bankruptcy with a net worth of approximately $130,000 was "an abuse of the legitimate bankruptcy process." *Zouhar*, 10 B.R. at 156. The Court found that the

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title.

debtor "did not want a mere *fresh* start, he wanted a *head* start." *Zouhar*, 10 B.R. at 156 (emphasis in original) (quoted in *Tveten*, 848 F.2d at 876). The *Zouhar* court phrased the problem thusly: "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered." *Zouhar*, 10 B.R. at 157 *citing Dolese v. United States of America*, 605 F.2d 1146, 1154 (10th Cir.1979) [6]. While there will be times when this Court cannot tell the difference between a pig and a hog, this is not one of those times. *See Tveten*, 848 F.2d at 879 (Arnold, J., dissenting).

In a case decided the same day as *Tveten*, *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866 (8th Cir.1988), the Court of Appeals found that the bankruptcy court's finding that there was no intent to defraud the creditors was not clearly erroneous. The amount in controversy in that case was roughly $30,000. In the *Tveten* case, Judge Arnold dissented from the panels' decision, while in the *Hanson* case, he concurred. Judge Arnold did not find persuasive the majorities' affirmance on the grounds that in one case fraudulent intent was present, while such intent was not present in the other. What Judge Arnold found was the only significant difference between the two cases was the amount of the exemption that was claimed in the *Tveten* case ($700,000) compared to the amount of the exemption claimed in the *Hanson* case ($30,000).

Even assuming Judge Arnold to be correct, that the amount was the key factor influencing the majorities' decisions, the amount of the claimed exemption should not be taken lightly. The amount of the claimed exemption provides information about the debtor's intent, and whether the debtor acted reasonably.

The debtors in *Hanson* converted non-exempt property into various types of exempt property, including $20,000 worth of life insurance, and an $11,000 pre-payment on the mortgage on their homestead. These modest amounts reflect not greed and calculation, but an honest attempt to use the state's exemption laws. In *Tveten*, on the other hand, the debtor attempted to claim $700,000 worth of life insurance as exempt. This case is clearly more like *Tveten* than *Hanson*.

This Court has previously stated that "exemptions should further one or more of the following social policies:"

(1) To provide the debtor with property necessary for his physical survival;

(2) To protect the dignity and the cultural and religious identity of the debtor;

(3) To enable the debtor to rehabilitate himself financially and earn income in the future;

(4) To protect the debtor's family from the adverse consequences of impoverishment;

(5) To shift the burden of providing the debtor and his family with minimal financial support from society to the debtor's creditors.

*In re Ellingson*, 63 B.R. 271, 277–78 (Bankr.N.D.Iowa 1986) [7] *citing* Resnick, *Prudent Planning or Fraudulent Transfer? The Use of Non-exempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy*, 31 Rutgers L.Rev. 615, 621 (1978). Allowing the Debtors to walk away from their financial obligations with over half a million dollars in exempt property does not comport with the above listed social policies. The social policies listed above are to ensure that the debtor has the minimum necessities to enable the debtor and the debtor's family to survive, and to ensure that the debtor and debtor's family do not become a welfare case. Certainly, over half a million dollars in life insurance (in addition to a $100,000 homestead and $20,000 of machinery) will enable the Debtors to do that and much more. Allowing the Debtors their claimed exemptions would make a mockery of the exemption and bankruptcy systems. The

---

**6.** The court in *In re Johnson*, 80 B.R. 953, 961–62 n. 9 (Bankr.D.Minn.1987), discussed other variations of this homily, and compared it favorably (marginally) to the so-called "smell test."

**7.** *Ellingson* was cited with approval by the *Tveten* court. *Tveten*, 848 F.2d at 875, 876.

amounts of money involved are what make this case and the *Tveten* case so troubling. The judicial system has always had to create limits on statutes when the legislature failed to do so. This is no exception. The Iowa legislature, in enacting the insurance exemption statute, intended that "just and reasonable" results flow from the statute. *See* Iowa Code § 4.4(3) (1987).

The Court's conclusion regarding the excessive amount of the claimed exemption is consistent with the Iowa Supreme Court's view of the insurance exemption laws. In *Westinghouse Credit Corp. v. Crotts,* 98 N.W.2d 843, 846, 250 Iowa 1273, 1276 (1959), the Iowa Supreme Court stated: "Section 511.37 was enacted to grant liberal exemptions *where needed* and it must be liberally construed." *Crotts,* 98 N.W.2d at 846, 250 Iowa at 1276 (emphasis added). The *Crotts* court thus recognized the potential for abuse that § 511.37 provided, but was not faced with such abuse at the time. The court continued on, finding that "the main purpose of [the exemption laws] is to support and protect the family, the spouse and children, and to educate and train the young." *Id.* A liberal construction is not the same as a grotesque construction, which the Debtors would have the Court adopt. The Debtors do not *need* over three million dollars in death benefits. A modest insurance policy would have sufficed "to protect the family, and to educate and train the young." Indeed, the Debtors are in fact retaining a modest amount of insurance protection. The *Crotts* court noted: "[T]he legislature intended to be definitely liberal in extending protection from their creditors to those who choose to protect themselves and their families by providing insurance against many of the possible vicissitudes of life." *Crotts,* 98 N.W.2d at 845, 250 Iowa at 1275. The only "vicissitude of life" the Debtors are protecting themselves against is the Federal Land Bank's decision not to share in the loss of value the Debtors' land suffered.

The result this Court reaches is also consistent with past decisions by this Court regarding exemptions claimed under statutes with no monetary limit. *See In re O'Brien,* 67 B.R. 317, 318 (Bankr.N.D.

Iowa 1986) (Insurance cost debtor $46,000); *In re Bertram,* 59 B.R. 186, 187 (Bankr.N. D. Iowa 1986) (Cash value life insurance of $14,131 claimed as exempt); *In re Breuer,* 68 B.R. 48, 49 (Bankr.N.D. Iowa 1985) (Insurance cost debtor $53,600); *see also In re Ellingson,* 63 B.R. 271, 274 (Bankr.N.D. Iowa 1986) (Livestock, crops and machinery valued at $55,400 transferred into payments on homestead). In each case, the claimed exemption was allowed. But in no instance did any of the debtors in the above mentioned cases go to the extreme lengths as these Debtors.

#### 4. Good Faith

Dverg Krantz' testimony indicated a lack of good faith regarding the Debtors intent to provide by moderate premiums some protection to the beneficiaries of the life insurance policies. Mr. Krantz testified that he wanted to provide insurance benefits sufficient to pay off the loan to the Federal Land Bank to enable his survivors to keep the farm in the event of his death. While this motive facially seems valid; the fact is that because of the Debtors' actions, they would lose the farm. Purchasing the life insurance policies only meant that the Debtors would default on the Federal Land Bank payment due on January 1, 1987. The Federal Land Bank holds valid liens on the Debtors' real estate. The Federal Land Bank began foreclosure proceedings in mid–1987. The Debtors obtained a stay of those proceedings by filing bankruptcy. But for bankruptcy, the Federal Land Bank could have had a judgment of foreclosure entered against the Debtors' real estate. The life insurance policies would certainly pay handsome dividends upon the demise of the named insured, but would not accomplish what Mr. Krantz testified he intended to do.

The type of insurance the Debtors purchased also indicates an actual intent to hinder, delay or defraud their creditors. Although not all the insurance policies were of the same type, the policies are what is known generally as universal life insurance policies. "[A] universal life insurance policy [is a policy] which permits the payment of a substantial single premi-

um which is then invested by the insurance company and the income used to pay future premiums." *In re Sayler,* 68 B.R. 111, 115 (Bankr.D.Kan.1986). Life insurance policies known as "term insurance" allow for much smaller premiums while giving comparable coverage. Had the Debtors purchased term policies, they would have left much more of their property as non-exempt, while still providing protection for their dependents. Additionally, they would have been able to keep the farm by making payments to the Federal Land Bank.

The Debtors had a term life insurance policy which provided for death benefits of about $200,000. Although the precise date is unclear, the Debtors let this policy lapse. Yet in 1986, they began purchasing coverage again. The Court finds it difficult to accept Mr. Krantz' testimony that he suddenly became concerned about what would happen in the event of his pre-mature death. Had he honestly had such concern, he would have kept the $200,000 term life insurance policy in effect.

### 5. Length of Time between Purchase of Life Insurance and Bankruptcy

One of the most difficult facts this case presents is the length of time between the purchase of the life insurance policies and the filing of bankruptcy. The Debtors first purchased life insurance (as part of the objected to series of transactions) on April 21, 1986. The last purchase was made on December 16, 1986 (payment made in January, 1987). The Debtors did not file bankruptcy until April 28, 1988, more than one year after the last of the objected to purchases and more than two years after the first of the objected to purchases. Most bankruptcy provisions only allow for a maximum of a one-year reach back period. *See e.g.,* 11 U.S.C. § 1141(d)(3)(C) (in conjunction with 11 U.S.C. § 727(a), denial of discharge); 11 U.S.C. § 547(b) (recovery of preferential transfers from insiders); 11 U.S.C. § 548(a) (recovery of fraudulent transfer). These Bankruptcy Code sections, of course, are based on federal law and this case is governed by state law. Section 544(b), however, ties in to state fraudulent conveyance law. The court in

*In re Robbins,* 91 B.R. 879, 883 (Bankr.W. D.Mo.1988), noted that the bankruptcy court is "to apply the forum state's statute of limitations governing fraudulent conveyances." The pertinent statute of limitations is found in Iowa Code § 614.1(4) (1987), which states that actions "for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery [may be brought] within five years." Thus, Iowa law, which this Court must rely on in determining the allowability of the claimed exemptions, allows a reach back period of five years. The Debtors' disposition of their non-exempt property into exempt property occurred less than five years prior to the date that this objection was made.

The time period between the purchase of insurance and the filing of bankruptcy should not benefit the Debtors. When the Debtors purchased most of the insurance policies, they were not in default on their Federal Land Bank loan. They made the January 1, 1986, payment as required. The life insurance was purchased during 1986. The next payment to Federal Land Bank was due January 1, 1987. Sometime in December, 1986 or January, 1987, the Debtors met with Federal Land Bank officials and disclosed the insurance purchases. At that time, the Debtors presented Federal Land Bank with the balance sheets the Debtors had prepared. Until January 1, 1987, had passed without payment from the Debtors, Federal Land Bank could do nothing, as there was no default on the loan. Once the Debtors defaulted, the Federal Land Bank's options were still limited. The Debtors are farmers (or at least were farmers at the time of the default). Farmers receive special treatment under the Bankruptcy Code. An involuntary case may not be commenced under the Bankruptcy Code against a farmer. 11 U.S.C. § 303(a). Thus, the Federal Land Bank could not file an involuntary petition against the Debtors to take advantage of the Bankruptcy Code's statutory time periods. The Federal Land Bank was forced to play on terms the Debtors dictated. One option the Federal Land Bank had was to commence foreclosure proceedings against

the Debtors in state court, which the Federal Land Bank did.

To allow the Debtors to claim that because the transfers took place well before the "eve of bankruptcy" and thus do not indicate fraudulent intent would work a manifest injustice. The length of time between the purchase of the life insurance and the filing of bankruptcy actually indicates a very well thought out and sophisticated scheme on behalf of the Debtors to hinder, delay or defraud the Federal Land Bank. That the Debtors did not do what most unsophisticated debtors seem to do—convert non-exempt property into exempt property and file bankruptcy a very short time later—only reflects the sophistication of the Debtors.

The problem of sophisticated debtors going outside the time limits set forth in the Bankruptcy Code has been discussed by commentators. One notes:

> [A] debtor's conversion of assets to exempt categories within ninety days of filing a bankruptcy petition might be subjected to special scrutiny by a bankruptcy court. Sophisticated debtors would then convert more than ninety days before filing their petitions. Less sophisticated debtors would be caught by the ninety-day rule.
>
> \* \* \* \* \* \*
>
> Under the existing system, all sophisticated debtors are free to convert. Under a system that restricts conversion, some sophisticated debtors will be caught by the restrictive rule while the most sophisticated debtors, who will plan around the new limits may still convert.

Eisenberg, *Bankruptcy Law in Perspective: A Rejoinder*, 30 UCLA L.Rev. 617, 622 (1983); *see also* Resnick, *supra*, 31 Rutgers L.Rev. at 650.

Mr. Krantz admitted on the witness stand that he converted the non-exempt property into exemptible life insurance so that the Federal Land Bank could not reach the property. He testified that he subsequently offered to make payments to Federal Land Bank out of the cash value of those insurance policies, if the Federal Land Bank would reduce the principal and interest owed by the Debtors.

The fact that the Debtors had been negotiating with the Federal Land Bank for some length of time prior to the life insurance purchase, and did not default on their loan until January 1, 1987, lends further support to the Court's conclusion. During all the negotiations in 1986, the Debtors never revealed to the Federal Land Bank that they were purchasing life insurance. To be sure, the Debtors may have had no obligation to reveal the purchases to the Federal Land Bank. The Debtors assert that they never concealed the purchases from the Federal Land Bank. Their failure to reveal the purchases to the Federal Land Bank indicates less than good faith.

The court in *In re Reed*, 700 F.2d 986, 991 (5th Cir.1983), noted that the debtor's actions in obtaining a reprieve from collection efforts by his creditors for a year was an indication of fraudulent intent, when during the reprieve the debtor converted his non-exempt property into exempt property. While what the Debtors did with the Federal Land Bank was not as blatant as what the *Reed* debtor did with his creditors, the Debtors' actions also indicate a fraudulent intent. When the Debtors found out from the Federal Land Bank that the Federal Land Bank would adhere to the terms of the loan agreement, the Debtors did what sophisticated debtors do. After consultation with an attorney about how to shield their assets, the Debtors systematically liquidated all their investments and used the proceeds to purchase life insurance. The Court finds that the facts associated with the length of time between the purchasing of the policies and the filing of bankruptcy indicate an actual intent to hinder, delay or defraud the Federal Land Bank.

6. Amount of Non-exempt Property Remaining After the Purchases of Life Insurance & Retention of Use

The Debtors converted about $300,000 of non-exempt investments, stocks, bonds and interest into life insurance. They had no more investments to convert. The bankruptcy schedules the Debtors filed indicate

non-exempt or unencumbered property of only approximately $8,000 remaining after the purchase of life insurance. Throughout most of 1986, the Debtors had nearly $100,000 worth of unencumbered machinery and equipment. On December 26, 1986, they borrowed $97,050 from Dverg Krantz' brother, Noel Krantz. As security for this debt, the Debtors granted a security interest to Noel Krantz in the machinery and equipment. The Debtors put this money from Noel Krantz into life insurance. Dverg Krantz testified that when the money was borrowed from Noel Krantz, the Debtors intended to use the $97,050 for farm operating expenses, to use for planting the 1987 crop. Dverg Krantz testified that he put the $97,050 into life insurance to ensure the Federal Land Bank's inability to reach the money, and that only later did he decide not to operate the farm himself, but instead to rent it out on a cash rental basis.

On the date the note was executed, December 26, 1986, the Debtors were not in default on the Federal Land Bank debt. As discussed above, the Federal Land Bank could not reduce the Debtors' debt to judgment and obtain a judgment lien prior to December 26, 1986. The granting of a security interest to Noel Krantz ensured the fact that the Federal Land Bank would not be able to reach the Debtors' machinery.

Another indicia of fraudulent intent is the disposition of property while retaining the beneficial use of the property. In this case the Debtors were able to generate cash from their non-exempt farm machinery by borrowing the machinery's value from Mr. Krantz' brother and granting to the brother a security interest in the machinery. This had the practical effect of generating the cash value of the machinery for purposes of investing in life insurance, while allowing the Debtors to retain the use of the property. *In re Oberst*, 91 B.R. 97, 99 (Bankr.C.D.Cal.1988) (Listing retention of "the possession, benefit, or use of the property in question" as a badge of fraud); *Rouse v. Rouse*, 174 N.W.2d 660, 666 (Iowa 1970) ("unexplained retention by grantor of the possession of property

transferred" is a badge of fraud). Debtors' bankruptcy schedules indicate that the Debtors have been profiting by their retention of the machinery, in that they are renting out the machinery.

### 7. Debtors' Ability to Detail Actions Prior to Filing Bankruptcy and Source of Funds

A significant badge of fraud in this case is the Debtors' inability to detail actions prior to filing bankruptcy and the source of the funds used to purchase the life insurance. Conversion of property which is secured to a particular creditor to exempt property may in and of itself constitute grounds to deny the exemption. *Cox v. Waudby*, 433 N.W.2d 716 (Iowa 1988), (Denying homestead exemption on the grounds that debtor, through fraud, converted secured property into homestead); *Eide v. Rodemeyer (In re Rodemeyer)*, 99 B.R. 416, 423–24 (Bankr.N.D.Iowa 1989) (Denying claimed life insurance exemption on the grounds that debtor converted secured property into life insurance). Likewise, many courts have held that the conversion of secured property constitutes grounds for objection to the dischargeability of a particular debt under § 523(a) of the Bankruptcy Code. *See, e.g., In re Long*, 774 F.2d 875, 881 (8th Cir.1985) (Setting forth the applicable test to be applied "[w]hen transfers in breach of security agreements are in issue").

As indicated, Mr. Krantz was very vague as to the source of the money used to purchase the life insurance policies. Much of the Court's information concerning the source of funds was gleaned from the Debtors' tax returns, and in particular Schedules B and D, showing the receipt of interest and dividends as well as the sale of stocks and bonds during 1985 and 1986. Information obtained from the tax returns, as well as the other evidence and testimony, leads the Court to conclude that approximately $663,000 was used to obtain exempt property in 1985 and 1986 ($127,000 to pay off the second loan, plus $536,000 to purchase life insurance). The evidence and

testimony only account for $427,000 as a source for those funds: Approximately $300,000 of interest, dividends and sale of stocks and bonds as shown on the tax returns; $30,000 in an account known as the future payment fund maintained with the Federal Land Bank, and the $97,050 loan from Noel Krantz. Mr. Krantz was either unable or unwilling to account for the balance of the funds used to purchase the life insurance and pay off the second Federal Land Bank mortgage.

Of particular concern to the Court was Mr. Krantz' failure to explain what happened to the 1986 rents and crops, events which should not have been difficult to recall. The Federal Land Bank holds a valid mortgage on the Debtors' land. The mortgage grants to Federal Land Bank the "rents, issues, crops, and profits arising from" the mortgaged property as security for the Federal Land Bank debt. The Iowa Supreme Court held in *Federal Land Bank of Omaha v. Lower*, 421 N.W.2d 126, 128 (Iowa 1988), that as between the lender and the debtor, such a "rents and profits" clause grants to the lender a security interest in the cash rents and profits from the land. The Federal Land Bank has contended that at least part of the money that went into the cash value life insurance came from the 1986 farm rent and proceeds of crop sales. The Debtor was extremely vague as to the disposition of the 1986 rent and crops. The Court must conclude that the Debtors chose to use at least part of the crop which secured the Federal Land Bank debt to purchase life insurance in lieu of using that property to make the January, 1987 payment.

■ Mr. Krantz contends that he was not in default prior to January 1, 1987, and therefore had no duty to account to the Federal Land Bank for the 1986 crops. Even if that argument were valid, that does not explain or excuse the Debtors' conversion of the 1987 rental payments to his own use. Mr. Krantz testified he used the 1987 rental payments for real estate taxes, professional fees and living expenses. That money was used after the Debtors had decided not to make the Janu-

ary 1, 1987, payment to Federal Land Bank and after the Debtors had defaulted on the loan. The Debtors were fully aware at the time they used that money and converted it to their own use that the Federal Land Bank was in the process of commencing foreclosure proceedings and was seeking the appointment of a receiver. While this use of the 1987 rent occurred after the life insurance policies were purchased in 1986, the Court believes that the use of the 1987 rents to pay real estate taxes, professional fees and personal living expenses is further extrinsic evidence of the Debtors intent to hinder, delay or defraud the Federal Land Bank.

### 8. Reliance on Counsel

■ The Debtors cannot escape the finding of actual intent to hinder, delay or defraud their creditors by claiming reliance on counsel. *See In re Norwest Bank, Nebraska, N.A. v. Tveten*, 848 F.2d 871, 876 (8th Cir.1988) (Reliance must be reasonable); *In re Ellingson*, 63 B.R. 271, 276 (Bankr.N.D.Iowa 1986) *citing In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir.1986) (Reliance must be in good faith). The Debtors engaged in pre-bankruptcy "planning with a vengeance." *In re Johnson*, 80 B.R. 953, 957 (Bankr.D.Minn.1987). Not only did they convert over three hundred thousand dollars worth of non-exempt stocks and bonds, they also made sure the Federal Land Bank could not reach their machinery and equipment. The Debtors were left with virtually no non-exempt property after they implemented their pre-bankruptcy planning.

The Debtors, frustrated by declines in land value and rising interest rates, wanted Federal Land Bank to absorb part of their loss. The Federal Land Bank would not let the Debtors off, under the terms the Debtors wanted. The Debtors looked for alternate ways of putting pressure on the Federal Land Bank. The Debtors chose to convert all of their non-exempt property into exempt property in order to enhance their bargaining position with the Federal Land Bank. This motivation for the conversion of the non-exempt property into exempt property is an indication that the

Debtors' reliance on advice of counsel lacked the essential element of good faith.

Likewise, the Debtors' reliance on advice of counsel to claim over half a million dollars of life insurance was not reasonable. The cases cited in previous sections of this opinion clearly indicate that the courts have closely scrutinized such aggressive pre-bankruptcy planning. To claim that the Debtors are entitled to over half a million dollars of exempt life insurance in addition to an exempt homestead worth in excess of $100,000 because an attorney advised that they were so entitled is not reasonable reliance on the advice of counsel.

## CONCLUSION

In conclusion, the Court finds that the Federal Land Bank has met its burden of showing that the Debtors converted non-exempt property into exempt property with the intent to hinder, delay or defraud creditors. Taking all of the factors discussed above into consideration, the Court must conclude that the extrinsic evidence of fraud required to show the necessary intent to defraud creditors has been demonstrated in this case. Accordingly, the objection to exemption filed by Federal Land Bank shall be sustained.

## II. HOMESTEAD EXEMPTION

■ The Debtors also claim as exempt their homestead, which encompasses the 40 acres upon which their residence is located. The Federal Land Bank objects to this exemption on the grounds that the homestead is not exempt as to those debts contracted prior to the acquisition of the homestead. Iowa Code § 561.21(1) (1987). The Federal Land Bank is not alleging that the homestead was acquired with the intent to hinder, delay or defraud the Federal Land Bank. Rather, the Federal Land Bank relies solely upon the statutory exception to Iowa's homestead exemption for pre-acquisition debts.

It is undisputed that the 40 acres in question did not become the Debtors' homestead until approximately 1½ years after the debt to Federal Land was contracted. However, as indicated above, the Debtors obtained a release by the Federal Land Bank of the mortgage as to the 40 acre homestead in exchange for granting a supplemental mortgage on 160 acres of otherwise unencumbered real estate. The issue before the Court is whether the Federal Land Bank effectively waived its right to proceed against the homestead when it executed the mortgage release pursuant to the agreement between the parties.

The Court concludes that it was the intent of Federal Land Bank to waive its right to proceed as against the homestead at the time the agreement was negotiated. The agreement was entered into at a time when the Debtors and Federal Land Bank were having extensive negotiations concerning restructuring of the Federal Land Bank debt. The Court cannot discern any other reason for the Debtors' willingness to pay over $100,000 to the Federal Land Bank in order to obtain a release of the second mortgage encumbered by the 160 acres, except, to consummate an agreement which would leave the homestead property free and clear of all claims by the Federal Land Bank.

Likewise, the situation as to the homestead is significantly different than the purchase of the life insurance. The negotiations to free the homestead property from the Federal Land Bank debt were done openly with full disclosure to the Federal Land Bank. The Federal Land Bank was well aware of the Debtors' motivation and that the Debtors were relying on the agreement to release the Federal Land Bank's claim to the homestead property. To now claim that the Federal Land Bank retains some residual rights in that property by virtue of the pre-acquisition exception to the homestead exemption contradicts what the Court believes was the clear intent of the parties at the time the agreement was entered into.

## ORDER

IT IS HEREWITH ORDERED that the objection to Debtors' claim of exemption in the cash value of life insurance policies acquired on or about April 21, 1986, and thereafter is sustained.

IT IS FURTHER ORDERED that the objection to Debtors' claim of homestead exemption is overruled.